# Illinois Official Reports

## Appellate Court

---

### *People v. Cerda*, 2021 IL App (1st) 171433

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERTO CERDA, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>No. 1-17-1433 |
| Filed | June 3, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-10290; the Hon. Timothy Joseph Joyce, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and Brett C. Zeeb, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Mari R. Hatzenbuehler, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE LAMPKIN delivered the judgment of the court, with opinion.<br>Presiding Justice Gordon and Justice Martin concurred in the judgment and opinion. |

# OPINION

¶ 1    Following a jury trial, defendant Roberto Cerda was convicted of the murders of Andres Butron, Hector Romero (Little Smurf), and Ernesto Alequin (Papo) and sentenced to natural life in prison. At trial, the court allowed evidence of other crimes involving two illegal narcotics conspiracies with the "Ibarra crew," which comprised Arturo Ibarra, Raul Segura, and defendant. Defendant's role in Ibarra's crew was that of "watchdog." Evidence detailing multiple prior drug transactions with the Ibarra crew and victims Butron and Alequin (the Butron/Ibarra conspiracy), as well as with Renoras McDonald and brothers Stephen and Tyrece Bailey (the McDonald/Bailey/Ibarra conspiracy), was admitted at trial. Also admitted at trial, without objection, was cell site location information (CSLI) that was obtained by the police without a warrant. Defendant appeals, alleging that (1) the State failed to prove his guilt beyond a reasonable doubt, (2) the trial court abused its discretion in admitting other-crimes evidence, and (3) defendant was denied the effective assistance of counsel, where his attorney failed to move to suppress CSLI for his cellular phone. For the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3    In November 2009, Angelica Foeller resided at 2356 South Christiana Avenue with Andres Butron, along with their baby daughter and Foeller's son. Butron, who was on parole for selling drugs, worked at the Willie Wonka candy factory, where he did not earn much money. On one day in November, Foeller and Butron were at the Target store at 47th Street and Pulaski Avenue when they met two acquaintances of Butron's: a man named "Toro" (later identified as Ibarra) and a second unnamed individual (later identified as Raul Segura). Foeller became suspicious when the conversation turned to a proposed "construction business" because Foeller knew that Butron did not work in construction. When Butron instructed Foeller to go to the baby section of the store to get things for their daughter while he spoke with the men, Foeller refused because she was concerned for Butron. At the end of the conversation, Ibarra gave Butron his phone number, which Butron then saved in his cellular phone. At the time, Foeller did not know that Butron used more than one phone. Foeller later learned that the number associated with this second phone was (773) 573-0868.

¶ 4    On the drive home, Butron told Foeller that he wanted to get back into the drug business. Butron intended to be the "middleman" and locate buyers to purchase drugs from Ibarra. When Angelica noticed that Butron had extra money in his possession, she inquired about it, and Butron told her that they needed the money and that it came from a side job. He went on to explain that the extra money came from finding drug buyers for Ibarra. Believing that it would be better for her to carry the drugs since Butron was on parole, Foeller arranged to help him with the sales.

¶ 5    "Papo," later identified as victim Ernesto Alequin, was one of Butron's customers. Foeller described a drug sale that took place in December 2009. Accompanied by Foeller and their infant daughter, Butron drove to the parking lot of a strip mall at 47th Street and Kedzie Avenue, where he parked his car. While Foeller remained seated in the car with the baby, Butron walked down the alley to a garage where other people were standing. Butron returned with a sample of cocaine and handed it to Foeller, who then put the sample in her purse. They then went to meet Alequin at a public park, where, in exchange for the sample, Alequin gave Foeller a bag containing $5600.

¶ 6        Foeller separated out their share of $600, and Butron drove back to the strip mall to give Ibarra the remaining $5000. Ibarra was accompanied by the man whom Foeller had originally seen in November at the Target store (Segura), along with another man, whom Foeller would later identify as defendant, Roberto Cerda. Butron brought the bag with the $5000 to Ibarra's pickup truck, which bore "Santa Muerte" stickers on the back, and got inside the truck with Ibarra. Defendant, whom Foeller referred to as "the watchdog," stood outside and was "watching all over."

¶ 7        After making the transaction, Butron returned with the bag and handed it to Foeller. It contained multiple packages of drugs. After calling Alequin to inform him that Butron had Alequin's "stuff," Alequin drove back to the park and made the exchange. Between December and May 2010, Butron, Foeller, Alequin, and Ibarra conducted three or four deals in the same manner. For every transaction, defendant stood outside of Ibarra's truck, performing a "watchdog" function.

¶ 8        In March 2010, Butron told Foeller that he was concerned about a drug deal that Foeller had not participated in, among Butron, Alequin, and Ibarra. Butron was worried because Alequin underpaid Ibarra for the drugs that he had purchased from him.

¶ 9        The Ibarra crew was involved with other buyers in March 2010. One of them, crack cocaine seller Renoras McDonald, nicknamed "Oke," met a new supplier, introduced as "Migo" (Ibarra) at the home of his friends, brothers Stephen and Tyrece Bailey, who lived at 66th Street and Albany Avenue. Ibarra was accompanied by a second man, later identified as defendant, Roberto Cerda. After cooking a small amount of the cocaine, McDonald declined to make the purchase because he determined the cocaine to be of poor quality. McDonald told Ibarra that he would be willing to do business in the future if Ibarra could get something better than what McDonald had cooked.

¶ 10       Four days later, McDonald returned to Stephen's house to buy cocaine from Ibarra. Ibarra was again accompanied by defendant, whose arm was in a cast. This time the sale went through, and McDonald paid Ibarra about $5000 in exchange for the cocaine. During the exchange, defendant was looking around, and McDonald asked Ibarra why defendant did not speak. Ibarra told McDonald that defendant was not there to talk and made a gesture in which he pointed his first two fingers and thumb in the air and moved his thumb up and down in a vertical direction. McDonald understood the gesture to mean that defendant was there to shoot if something went wrong. Ibarra gave McDonald two phone numbers that McDonald could use to contact him.

¶ 11       Three days later, McDonald was again at Stephen's house to make another drug deal with Ibarra. Ibarra pulled up in a Durango truck and told McDonald and Stephen to come outside, whereupon Ibarra showed McDonald some cocaine. McDonald declined to buy the cocaine because the quantity was too small.

¶ 12       Then, on April 17, 2010, McDonald received a phone call from Ibarra, informing him that they would be "switching up" the way that exchanges would occur. In the future, Ibarra would require one day's advance notice and a specified requested quantity of drugs. The transfer would occur the following day at a place of Ibarra's choosing. McDonald arranged to meet Ibarra several days later to make another purchase.

¶ 13       On the evening of April 17, 2010, McDonald went to a nightclub with the Bailey brothers to celebrate McDonald's upcoming birthday. Tyrece Bailey told McDonald that he was going

to try to purchase more drugs from Ibarra because Ibarra's drugs were better than what Tyrece had.

¶ 14    Three days later, on April 20, 2010, McDonald explained to Stephen Bailey Ibarra's new rules for purchasing drugs. Stephen told McDonald that on April 21 Ibarra refused to sell Stephen drugs because too many people were with Stephen.

¶ 15    The following day, Stephen asked McDonald if McDonald had any means of contacting Ibarra. Later in the day, Stephen told McDonald that his cousin, Crawford Davis, could take Stephen to Ibarra. McDonald, who had been unsuccessful in buying drugs from Ibarra because of various excuses that Ibarra had been making, told Stephen to let McDonald know when he got the cocaine so that he could "cook it up" for Stephen. While McDonald knew how to cook the cocaine, Stephen did not. McDonald never heard from either Stephen or Tyrece again.

¶ 16    On April 22, 2010, Detectives Daniel Gorman and John Halloran were assigned to assist in the investigation of the narcotics incident involving the Bailey brothers and the Ibarra crew. The detectives requested that Chicago police intelligence officers locate an individual bearing the nickname "Okee" (McDonald). McDonald was located and interviewed by Detectives Gorman and Halloran. McDonald described Ibarra, the car that he drove, and the location that they were trying to "meet up at." He provided Ibarra's cell phone numbers and a description of Ibarra and defendant. After viewing photographs, McDonald identified Ibarra and defendant. Below defendant's picture, McDonald wrote "100%" because he was 100% certain about his identification of both defendant and Ibarra. McDonald also identified a photograph of Ibarra's truck, whose back window bore distinctive stickers.

¶ 17    The detectives learned that phone numbers provided by McDonald were registered to Sonia Ibarra of 4521 South Troy Avenue and that Arturo Ibarra resided with Sonia at that address.

¶ 18    On April 23, 2010, Sergeant Michael Bocardo and a team of about eight police officers were conducting surveillance at 4521 South Troy Avenue regarding the investigation of the narcotics incident involving the Bailey brothers and the Ibarra crew. Two of the officers on the intelligence team, Eric Wier and Anthony Rotkvich, received a radio transmission informing them that three individuals left the residence and got into a car. Officer Wier followed the described car and, after seeing the car travelling at a high rate of speed and moving erratically in and out of lanes, conducted a stop at Archer and Lawndale Avenues. Seated in the driver seat was Arturo Ibarra. Raul Segura was seated in the front passenger seat, and defendant, who had a cast on his arm, was seated in the rear passenger seat. In the process of ascertaining the identities of the three men, Officer Wier learned that defendant's driver's license was suspended. After the identities of all three men were established, they were released without being arrested.

¶ 19    While the police investigation into the narcotics incident involving the Bailey brothers and the Ibarra crew continued, a large drug transaction involving the Butron/Ibarra conspiracy was planned for May 17 at 6 p.m. Butron's share of this drug deal was to be $1000, and the deal involved Butron, Alequin, and a third person, "Little Smurf" (Hector Romero). The exchange was delayed because Alequin was still in the process of getting the money together to make the purchase. At 9 p.m., Alequin called Butron to tell him that Alequin had the money and was ready. Butron told Foeller, who expected to accompany him, that she was to wait for him at home. Butron got into a white car and drove off. Foeller never saw Butron alive again.

¶ 20    The following day, May 18, 2010, at about 6 a.m., Orville Broch was on his way to work at Aculabs at 48th Place and Whipple Street. While Mr. Broch was parking his car, a person

who was driving by stopped and told Mr. Broch, "You should call 911 because I think there's a dead guy in the car." Mr. Broch walked over to the car, noticed that the windows were all steamed up, and, upon seeing a person in the car, returned to the plant and called 911.

¶ 21    The police arrived and processed the scene. Detective Anthony Padilla examined the scene and observed two bloody bodies, bound with duct tape and zip ties, seated in the back seat of what Detective Padilla would learn was Hector Romero's white four-door Avalon. The two victims seated in the rear seats would later be identified as Hector Romero and Ernesto Alequin. Romero, who was slumped over Alequin's lap, had $500 in his pocket. In the trunk of the car the officers found the body of a third man, who would later be identified as Andres Butron, along with Butron's cellular phone. Before the victims' bodies were removed from the car, it was towed to the medical examiner's office. Firearms evidence, including four Winchester .40-caliber Smith & Wesson cartridge casings, an FOA .25-caliber automatic cartridge case, and a live R&P .40-caliber Smith & Wesson bullet, were later recovered from the car. Biological samples were also collected.

¶ 22    The same day, autopsies were conducted on the bodies of the victims by forensic pathologist Dr. Hilary McElligott. Dr. McElligott determined that both Alequin and Romero died as a result of multiple gunshot wounds, while Andres Butron died as a result of positional asphyxia, meaning, being placed in a position where he was physically unable to breathe. In the process of conducting the autopsies, Dr. McElligott inventoried multiple projectiles, all of which appeared to her to be similar.

¶ 23    Subsequent investigation revealed that a building owned by Philip Kim, located at 4747 South Kedzie Avenue, had exterior cameras, installed by him for security and to protect his merchandise. Mr. Kim was responsible for maintaining the accuracy of the date and time stamps on images that the camera captured. Mr. Kim showed the police video images that were captured on the cameras between 7 and 10 p.m. on May 17, 2010, and between 1 and 7 a.m., on May 18, 2010. At the request of Detective Timothy Cerven, digital images from one of the cameras were later downloaded, transferred to a digital video disk, and inventoried by police officer David Heppner.

¶ 24    On May 18, 2010, while the identities of the victims were still unknown, Detective William Brogan drove a covert vehicle to the area of 4521 South Troy Avenue and parked four or five car lengths north of the house, where he had a clear view of the front of 4521 South Troy Avenue. Based on the investigation into the narcotics incident involving the Bailey brothers, Detective Brogan knew that Ibarra lived at 4521 South Troy Avenue. Less than a half-hour after parking his car, Detective Brogan saw an older model black Mercury Grand Marquis, driven by defendant, pull up to 4521 South Troy Avenue. Detective Brogan observed defendant walk up to the front porch at 4521 South Troy Avenue, and upon seeing the front door open a crack, Detective Brogan saw defendant retrieve an item from the arm of the person on the other side of the door, whereupon defendant got back into the Grand Marquis, drove into the alley between Albany and Troy Avenues, turned north, and parked behind the garage at 4521 South Troy Avenue.

¶ 25    Detective Brogan again observed defendant exit the Grand Marquis with what appeared to be a garage door opener in his hand, which defendant then used to open the overhead door and enter the garage. Next, defendant exited the garage carrying what appeared to be a blue or black coat or blanket spread across both of his arms and placed the items underneath it inside

the trunk of his car. Detective Brogan radioed his observations to the other officers on the surveillance team.

¶ 26    After receiving the radio transmission, Officers Wier and Rotkvich stopped the car, a four-door 1991 Mercury Grand Marquis bearing decals and an improperly displayed license plate and approached the car on foot. Officer Wier approached the driver's side, where defendant was seated, and Officer Rotkvich approached the passenger side, where Blanca Dongu was seated. Officer Wier asked defendant if he had a driver's license. When defendant replied that he did not have a driver's license and told Officer Wier that his license had been taken away, Officer Wier asked defendant to step out of the car and told defendant that he was being arrested for driving on a suspended license.

¶ 27    Officer Wier told defendant that he was going to perform a pat-down for weapons and told defendant that, in advance of patting him down, Officer Wier would like to know if there was anything that would potentially poke or stab Officer Wier. Defendant replied that he did not have any weapons on his person but that he did have guns in the trunk of his car. Officer Wier located a 12-gauge sawed-off shotgun and a .22-caliber rifle under the black coat in the trunk of the car. Introduction of this evidence at trial was accompanied by a limiting instruction, informing the jury that this evidence could only be received for the limited purpose of considering the police investigation and that it was for the jury to determine whether defendant was involved in this conduct and, if so, what weight should be given to it on the issue of the course of the police investigation.

¶ 28    Defendant and Dongu were separately transported to Area One headquarters at 51st Street and Wentworth Avenue, while defendant's car was transported to a Chicago police facility at 10300 South Doty Avenue for processing. Forensic investigator Officer Richard Strugala processed the Grand Marquis, which bore decals on the right and left rear vent windows, containing the words "fear me." From the trunk, Officer Strugala inventoried a black coat along with an envelope, a pair of gloves, and zip ties. Gloves were also recovered from underneath the driver's seat. The brake pedal, gas pedal, and floor mats were also recovered. Multiple swabs were taken for potential gunshot residue.

¶ 29    Officer Strugala was also assigned to process the white Avalon that the victims were found in. He searched for trace evidence, took photographs of the car, collected potential DNA evidence, and "super glued" the car, a process that involved heating some super glue, which then left a filament all over the car, which, in turn, made fingerprint ridges more easily visible to the naked eye. After determining that four ridge impressions were suitable to be lifted, they were taken, sealed, protected, and inventoried.

¶ 30    In the meantime, defendant was being held in an interview room at Area One. Defendant was wearing a dark T-shirt bearing the character of a skeleton with a hoody and a sickle and the words Santa Muerte. Sergeant Joaquin Mendoza, an official Spanish language translator for the Chicago police department, spoke to defendant in Spanish, advised defendant of his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)), and obtained consent for the taking of a buccal swab.

¶ 31    After indicating that he understood his *Miranda* rights and that he spoke both English and Spanish, defendant agreed to speak with Detective Brogan. Defendant admitted that the sawed-off shotgun and rifle were his. He said that Dongu did not know that the guns were in the car. Defendant told the detectives that the man who lived at 4521 South Troy Avenue was Arturo Ibarra and that Ibarra had allowed defendant to store the weapons in his garage.

¶ 32    Dongu was interviewed separately by Officers Wier and Rotkvich and Sergeant Mike Bocardo. Dongu, who lived with defendant at 5631 South Trumbull Avenue, told the officers that there were additional weapons at their residence and that she was worried for her children's safety, and she asked the police to remove the weapons from her home. Officer Rotkvich explained to Dongu that she needed to sign a consent form for the officers to remove weapons from her home. Dongu read and signed a consent form authorizing a search of her apartment. At trial, both officers denied that they or any other officer in their presence told Dongu that her children would be taken from her unless she signed the consent form.

¶ 33    After Dongu signed the consent form, the officers accompanied her to 5631 South Trumbull Avenue, where they recovered $4000 in cash, a bag of twist ties described by Officer Wier as "flex cuffs," and some cannabis. In the process of searching, when the officers showed Dongu some toy guns that they had found, Dongu shook her head and said "it's a silver gun. That's not it." Subsequently, Officer Rotkvich found a .40-caliber semiautomatic stainless steel Ruger handgun under a bag of rice on a shelf in the pantry.

¶ 34    Evidence technician Michael Parker processed the scene and collected and inventoried the "flex cuffs" that were found in the basement area, along with the .40-caliber semiautomatic weapon. Photos were taken of the residence, including figurines or statutes of skeleton-like figures of Santa Muerte.

¶ 35    After the recovery of the .40-caliber semiautomatic handgun, Detectives Brogan and Mendoza had a second conversation with defendant. Defendant admitted that this gun was also his, telling the detectives that the gun was a recent purchase that he made for personal protection and that he never let the firearm out of his house or lent it to anyone else to use. At trial, Detective Brogan admitted that the conversations with defendant were neither audiotaped nor videotaped, even though such equipment was available to him when the conversations occurred.

¶ 36    Meanwhile, on May 18, 2010, another member of the intelligence team, Officer Michael Jarosik, was in radio communication with other officers who were surveilling Arturo Ibarra. Officer Jarosik knew that Ibarra had an active, local traffic warrant. At 4:50 p.m., upon learning that Ibarra was travelling at a high rate of speed northbound from 63rd Street and Pulaski Avenue, Officer Jarosik caught up with Ibarra, activated the police vehicle's emergency equipment, and conducted a traffic stop at 5935 South Pulaski Avenue. Ibarra was driving a 2003 gray Dodge Ram pickup truck. When Officer Jarosik put out a message that he was curbing Ibarra's truck, other police officers responded to the scene.

¶ 37    When Officer Jarosik approached the pickup truck and asked Ibarra to exit, Ibarra complied, and Officer Jarosik arrested him. A custodial search of Ibarra revealed three separate bundles of cash. One of the backup officers, Sergeant Sanchez, searched the driver's compartment of Ibarra's car and recovered 12 rubber-banded bundles of cash in a black knit cap, a black sock, and a police scanner. A custodial search of Ibarra at the Eighth District police station revealed the presence of another bundle of cash in Ibarra's wallet, along with a picture of Santa Muerte. The combined cash from Ibarra's person totaled $4845, while the cash recovered from the car totaled $12,000.

¶ 38    In the meantime, Foeller went to the police station because she was worried about Butron's failure to return home. She was informed that Butron was found dead in a car. In the late evening hours of May 19, 2010, Detective John Halloran agreed to Foeller's request to meet her at 3100 West 48th Place, where they unsuccessfully searched for Butron's cell phone,

which Foeller had dialed multiple times. Foeller then agreed to accompany Detective Halloran to Area One, where she was interviewed by Detective Halloran and his partner, Detective Dan Gorman. At the time, Foeller was trembling, tearful, fidgety, and "hyper." She constantly looked around to see who else was in the area. Foeller told the detectives she believed "Turo" (Ibarra) was responsible for the murders. Based on his knowledge of the narcotics incident involving the Bailey brothers, Detective Halloran believed "Turo" to be Arturo Ibarra. Foeller later provided Detective Halloran with a phone number for Ibarra that Detective Halloran was familiar with: (773) 719-0380. Foeller also provided the name "Papo" (Alequin). At that time, because she was afraid for herself and her daughter, Foeller denied knowing anything about Butron being involved in the sale of drugs.

¶ 39 The police continued to investigate the matter, surveilling Arturo Ibarra and Raul Segura until the following February. On February 26, 2011, Detective Halloran learned that Raul Segura was in police custody. Segura had a Santa Muerte tattoo on his right upper arm and on his right lower leg. Detective Halloran learned that a phone number of (773) 870-8632 was listed for one "Julio Oria," which was an alias used by Segura.

¶ 40 Detective Halloran also learned that Arturo Ibarra had died the same day that Segura was taken into police custody. Morgue photos established that, as with Segura, Ibarra's right arm bore the same Santa Muerte tattoo. Arrest records from May 18, 2010, revealed that defendant bore the same tattoo on both his right and left arms.

¶ 41 On May 4, 2011, Detectives Halloran and Tom Vovos had another conversation with Foeller, who now appeared to be much more comfortable than she was the previous year. Foeller was not looking around or hyperaware of everything going on at the police area. After signing a photo spread advisory form and being shown multiple photo arrays, Foeller identified Ibarra, Segura, and defendant. Foeller identified Segura as the person who was with Ibarra when she and Butron first met them at the Target store, who was with Ibarra at every subsequent transaction that followed, and who would be seated inside the vehicle with Ibarra when Butron made the exchanges. She identified defendant as the "watchdog" who always stood outside Ibarra's vehicle. Foeller agreed to speak with an assistant state's attorney and, on May 9, 2010, returned to Area One and, after meeting with ASA Kelly Coakley, gave a written statement.

¶ 42 In addition to the foregoing, at trial, Blanca Dongu testified that in May of 2010, defendant was her boyfriend of six years and that the two resided at 5631 South Trumbull Avenue, with their two younger children and a third, older child of Dongu's. Defendant was employed by a chocolate factory, and his normal shift was from 4 a.m. to 4 p.m., after which time he would pick up their children from Dongu's mother's house, drive them home, and care for them. On May 17, 2010, defendant failed to follow this routine. He did not return home after work, did not pick up the children, and did not call Dongu. Dongu did not know where he was.

¶ 43 Defendant arrived home between 10 and 11 that night, and he was "mad." Dongu was also angry because defendant had no explanation for his disappearance and late-night return to their home. From his Grand Marquis, defendant retrieved a compact disc case containing cash. When Dongu asked defendant where the money came from, defendant told her not to worry about it. Defendant asked Dongu to count the cash, and upon doing so, she counted $4000 in twenties, tens, fives and single-dollar bills. She put the money away in a speaker. Dongu testified that, prior to that night, she was unaware of defendant coming home with such a large amount of cash.

¶ 44    Defendant went back to the car and returned to the apartment with a gun that was wrapped in newspaper. It was a silver semiautomatic that Dongu had never seen before. Defendant showed it to her and asked Dongu whether she liked it. When Dongu said "it was okay," defendant asked her to hold it. Dongu complied, told defendant that it was heavy, and handed it back to him. Defendant hid the gun in the second bedroom, and the two went to bed.

¶ 45    The following day, May 18, 2010, after dropping Dongu's oldest child at school, defendant picked up Dongu and their two younger children and drove around running errands. Although the Grand Marquis car was registered to Dongu, defendant drove because Dongu did not know how to drive. Among other errands, defendant went to pay his cell phone bill. Blanca testified that defendant's cell phone number was (773) 331-5317. While running errands, defendant drove to Ibarra's house at 4521 South Troy Avenue. Dongu testified that Ibarra, defendant, and Dongu's uncle, Raul Segura, used to do roofing work together.

¶ 46    While Dongu remained seated in the car with the children, defendant pulled up to the garage behind Ibarra's house, opened the garage door, and went inside. Defendant returned with a long object covered in a blanket, which he put inside the trunk. Defendant got back inside the car and resumed driving but was pulled over by the police, who ordered defendant out of the car and handcuffed him. Defendant told the officers that there were guns in the trunk of the car. Dongu did not know that there were guns in the trunk of the car. After the officers looked inside the trunk, defendant was put in a police car and driven away.

¶ 47    Dongu testified that she stood next to the Grand Marquis handcuffed while her children remained in the back seat of the car, after which time they were all taken to Area One. When Dongu told the officers that there was a gun in her house, the officers told her that she needed to sign a consent to search form "or else they were going to take my kids away." Dongu testified that her children were with her when the officers told her that they were going to take her children away and that she believed them.

¶ 48    Dongu went back to her apartment with the officers and unlocked the door for them. Dongu testified that her children remained outside with a police officer and that she was allowed to call her sister to pick them up. Dongu told the officers that money was hidden in the speaker, but the officers did not find it there, eventually locating it under the mattress in Dongu's and defendant's bedroom.

¶ 49    After the officers found the money, Dongu directed them to the second bedroom to find the silver gun. The gun, however, was not located in the second bedroom but was later discovered under a bag of rice on a shelf in the pantry.

¶ 50    Dongu was brought back to Area One, where she spoke with another detective. Later that day she left the station. At trial, Dongu denied that she was afraid of her uncle, Raul Segura, or that she declined to give a videotaped statement because she did not want her uncle or defendant to see her on video discussing this matter. She testified that her uncle Raul later accompanied her to see defendant's lawyer. Dongu did not know whether the recovered gun belonged to her uncle or to Arturo Ibarra.

¶ 51    Jon Flaskamp, a forensic scientist specializing in firearm and tool mark examination, described tests conducted on the gun that was retrieved from defendant's home, a Ruger Model T-94 semiautomatic pistol. The gun was determined to be the weapon that caused the deaths of Ernesto Alequin and Hector Romero.

¶ 52    The parties stipulated that, if recalled to testify, Detective Halloran would testify that during the course of the investigation the police determined that on May 17, 2010, Ernesto Alequin's cellular phone number was (773) 319-4517.

¶ 53    Over defense objection, forensic video analyst Grant Fredericks testified to his comparison of the digital images captured on Mr. Kim's cameras with digital still images of defendant's Grand Marquis and digital still images of an SUV. Mr. Frederick's comparison utilized the Digital Analysis Image System designed by the FBI for vehicle comparison work. In comparing the SUV photos with the videotape, Mr. Fredericks could only conclude that the SUV depicted in the video could not be eliminated as being the same as the known car, meaning "it might be, it might not be, the questioned vehicle is consistent, I see no differences, but there's not enough information to me for me to be able to offer anything else to the jury about that."

¶ 54    With respect to the Grand Marquis, however, Mr. Fredericks opined that, in comparing the video image taken at 21:25:46 to the still image of defendant's car, that "there is nothing about the questioned vehicle that can be used to eliminate the known vehicle." Mr. Fredericks's opinion was based, in part, on his finding that the decal in the still image of defendant's car window was consistent with a reflective white object in the same location of the car depicted on the video image. On cross-examination he clarified that his opinion meant that the car in the video could be or might be the same as the known car.

¶ 55    Special Agent Joseph Raschke, an expert in historical CSLI analysis testified about cellular phone records that he analyzed in this case for the dates of May 17 and May 18, 2010. The evidence established the following: defendant, who resided at 5631 South Trumbull Avenue, had a cell phone number of (773) 331-5317; Segura, who resided at 3032 South Keeler Avenue, had a cell phone number of (773) 870-8634; Ibarra, who resided at 4521 South Troy Avenue, had a cell phone number of (773) 719-0380; Alequin's cell phone number was (773) 319-4517; and Butron, who resided at 2856 South Christiana Avenue, had a cell phone number of (773) 414-9684.

¶ 56    Raschke's investigation of Butron established that on May 17, 2010, Alequin called Butron at 20:24:30, Butron then called Ibarra at 20:45:59, Alequin again called Butron at 20:47:02, Butron called Alequin at 20:47:43, Butron called Alequin again at 20:49:17, Ibarra called Butron at 20:54:02, and Ibarra called Butron again at 20:57:46. The last two calls that Ibarra placed to Butron established that Butron's phone had moved from the area of his home toward the area where the victim's bodies would later be discovered at 3100 West 48th Place.

¶ 57    Raschke's investigation of Segura showed that Segura called defendant on May 17, 2010, at 21:48 and 21:51:51 and called Ibarra at 22:13:11. The evidence established that Segura's phone was between Ibarra's home at 4521 South Troy Avenue and 3100 West 48th Place at 8:58 p.m., 9:01 p.m., 9:05 p.m., and 9:27 p.m. By 9:49 p.m., Segura's phone had moved to a location west of 3100 West 48th Place, and at 10:02 p.m. and 10:13 p.m., his phone was in the area of his home at 3032 South Keeler Avenue.

¶ 58    Raschke's investigation of defendant placed defendant's phone in the vicinity of Ibarra's home and 3100 West 48th Place at 6:52 p.m. on May 17, 2010. After 6:52 p.m., there were no further calls on defendant's phone until three hours later, at 9:57 p.m. At 9:57 p.m., 10:02 p.m., 10:04 p.m., 10:06 p.m. and 10:12 p.m., defendant's phone was in the area of defendant's house at 5631 South Trumbull Avenue.

¶ 59    Raschke's investigation of Ibarra established that on May 17, 2010, Ibarra called Butron at 20:45:35, at 20:53:40, at 20:57:28, that Segura called Ibarra at 22:13:11, Ibarra called Segura at 22:13:14, Segura called Ibarra at 22:45:17, and Ibarra called Segura at 22:45:18. Ibarra's phone was in the area of 3100 West 48th Place at 8:45 p.m., 8:53 p.m., 8:57 p.m. and 9:44 p.m. By 9:52 p.m., Ibarra's phone moved west of 3100 W. 48th Place. By 9:59 p.m., Ibarra's phone moved northbound, in the general area of Segura's home at 3032 South Keeler Ave. By 10:03 p.m., the phone had moved southbound, back in the direction of Ibarra's house. At 10:13 p.m. and 10:19 p.m., Ibarra's phone moved in a westerly direction. At 10:41 p.m., 10:42 p.m., and 10:45 p.m., it returned to an area near both Ibarra's house and 3100 W. 48th Place.

¶ 60    Over defense objection, a certified copy of a certificate of death for Arturo Ibarra, with a date of death of February 26, 2011, was admitted in evidence.

¶ 61    The parties stipulated that pursuant to the execution of a search warrant on February 27, 2011, at the detached garage at Ibarra's house 4521 South Troy Avenue, Special Agent Linda Engstrom recovered white zip ties on a bench in the garage and another white zip tie from the floor of the garage.

¶ 62    Wendy Gruhl, a forensic scientist with the Illinois State Police testified that she conducted DNA analysis in this case. She had reference standards from Andres Butron, Ernesto Alequin, defendant Roberto Cerda, and Hector Romero. Defendant was not the contributor of DNA on exhibit 10-A, a plastic tie, or on hair roots found on Ernesto Alequin's sweatpants

¶ 63    The parties stipulated that a left glove recovered from defendant's Grand Marquis contained a mixture of DNA profiles. Defendant Roberto Cerda could not be excluded from this mixture and was a possible donor of the major male DNA profile.

¶ 64    Former trace analyst Robert Berk testified that the zip ties recovered from Ibarra's home at 4521 Troy Avenue were the same size, thickness, and width as the ties recovered from the trunk of defendant's 1991 Mercury Grand Marquis and originated from the same source. Neither the cable ties recovered from 4521 South Troy Avenue nor from the Mercury Grand Marquis were, however, consistent with the cable ties used to bind the victims.

¶ 65    Mr. Berk testified that the gloves recovered from underneath the driver's seat of the Grand Marquis tested negative for gunshot residue, as did defendant's clothing. The left cuff of the jacket recovered from defendant's car, however, tested positive for primer gunshot residue, thereby indicating that the sleeve was in the environment of a firearm when it was discharged. Mr. Berk also tested two pairs of gloves recovered from the trunk of the Grand Marquis. The first pair of gloves had the name "Kimberle" on the right glove and "Karla" on the left glove. The right glove tested negative for GSR, and the right glove was inconclusive.

¶ 66    As to the second pair, both gloves tested positive for the presence of GSR, indicating that both had either contacted an item that had gunshot residue on it or were in the environment of a discharged firearm.

¶ 67    Lisa Kell, a forensic scientist with the Illinois State Police, compared DNA standards from Arturo Ibarra and Raul Segura with other evidence in this case and opined that Ibarra could not be excluded as the donor of the DNA mixture identified in exhibit 36B, the left-hand glove, and that neither Ibarra nor Segura could be excluded as the donor of DNA evidence recovered from hair roots found on the sweatpants of Alequin. With respect to the jacket recovered from defendant's car, the major DNA profile on the jacket matched Segura, and Ibarra could not be excluded from the minor DNA profile.

¶ 68     After the State rested, in defendant's case-in-chief the parties stipulated that Blanca Dongu previously testified in open court that Raul Segura is her uncle and has a daughter named Kimberly and a stepdaughter named Carla.

¶ 69     The jury convicted defendant of the first degree murders of Andres Butron, Ernesto Alequin, and Hector Romero. Following a sentencing hearing, defendant was sentenced to natural life imprisonment.

¶ 70                                    II. ANALYSIS
¶ 71                                   A. Reasonable Doubt
¶ 72     On appeal, defendant alleges that the State's evidence was insufficient to establish his guilt beyond a reasonable doubt. When the sufficiency of the evidence is challenged, a criminal conviction will not be set aside unless the evidence, when viewed in the light most favorable to the prosecution, is so improbable or unsatisfactory that a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). This standard applies in all cases, regardless of the nature of the evidence. *People v. Pollock*, 202 Ill. 2d 189, 217 (2002). A reviewing court may not retry the defendant. *People v. Rivera*, 166 Ill. 2d 279, 287 (1995). The trier of fact assesses the credibility of the witnesses and the weight to be given to their testimony, resolves conflicts in the evidence, and draws reasonable inferences therefrom, and we will not substitute our judgment for that of the trier of fact on these matters. *People v. Hommerson*, 399 Ill. App. 3d 405, 411 (2010). Testimony may only be found insufficient under the *Jackson* standard where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 73     To prove defendant guilty of first degree murder as charged in this case, the State had to prove that defendant or one for whose conduct he was legally responsible, without legal justification, performed acts that caused the death of each victim and did so intending to kill, knowing that his acts would cause death, or knowing that his acts created a strong probability of death or great bodily harm to each victim or as he was committing the offense of aggravated kidnapping. See 720 ILCS 5/9-1(a) (West 2010). A person is legally accountable for the conduct of another when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." *Id.* § 5-2(c). Accountability may be established either by showing that defendant shared the criminal intent of the principal or by showing the existence of a common criminal design. *People v. Fernandez*, 2014 IL 115527, ¶ 13. Intent may be inferred from both the character of a defendant's acts and the surrounding circumstances. *People v. Perez*, 189 Ill. 2d 254, 266 (2000).

¶ 74     The common design rule provides that, when two or more individuals engage in a common criminal design or agreement, any act in furtherance of that common design that is committed by one person is considered to be the act of all parties to the agreement and that all are equally responsible for any consequences of these further acts. *Id.* at 267.

        " 'Where one attaches himself to a group bent on illegal acts which are dangerous or homicidal in character, or which will probably or necessarily require the use of force and violence that could result in the taking of life unlawfully, he becomes accountable

                                        - 12 -

for any wrongdoings committed by other members of the group in furtherance of the common purpose, or as a natural or probable consequence thereof even though he did not actively participate in the overt act itself.' " *People v. Flynn*, 2012 IL App (1st) 103687, ¶ 23 (quoting *People v. Morgan*, 39 Ill. App. 3d 588, 597 (1976)).

Active participation is not required for the imposition of criminal liability under a theory of accountability, but mere presence, even if the defendant knows that a crime is being committed, is insufficient to establish accountability. *People v. Batchelor*, 171 Ill. 2d 367, 375-76 (1996).

¶ 75    In determining accountability, the trier of fact may consider the defendant's presence during the commission of the crime, the defendant's continued close association with other offenders after its commission, the defendant's failure to report the crime, and the defendant's flight from the scene. *People v. Taylor*, 164 Ill. 2d 131, 141 (1995). Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another. *In re W.C.*, 167 Ill. 2d 307, 338 (1995). Proof of the common purpose or design need not be supported by words of agreement but may be drawn from the circumstances surrounding the commission of an act by the group. *In re M.W.*, 232 Ill. 2d 408, 437 (2009). Additionally, a defendant may be found guilty under an accountability theory even though the identity of the principal is unknown. *People v. Cooper*, 194 Ill. 2d 419, 435 (2000).

¶ 76    Reviewing the evidence in the light most favorable to the State, we find that there was sufficient evidence for a rational trier of fact to find defendant accountable for the murders of Andres Butron, Ernesto Alequin, and Hector Romero. Substantial evidence established that the Ibarra crew committed the three murders, that defendant was an integral member of that group, and that he was legally accountable for the actions of the group.

¶ 77    Evidence of the Butron/Ibarra illegal drug conspiracy and the McDonald/Bailey/Ibarra illegal drug conspiracy established defendant's identity, his membership in the Ibarra crew, and the special "watchdog" function that he performed during the commission of the drug deals. McDonald's testimony regarding Ibarra's explanation of defendant's role allowed the jury to infer that defendant was more than a "lookout" but was present during the drug transactions to shoot if something went wrong. Where defendant's contribution to the Ibarra crew was to impliedly threaten the potential use of force to effectuate the illegal sale of drugs, he was an integral part of the group's common design and was accountable for any wrongdoing committed by the other members of the group in furtherance of those illegal acts.

¶ 78    Defendant's close affiliation with the Ibarra crew was physically demonstrated by the distinctive Santa Muerte tattoos that all three bore on their arms, by the Santa Muerte decals similarly displayed on their vehicles, by the Santa Muerte figurines found in defendant's home, and by the Santa Muerte picture found in Ibarra's wallet. The connection between defendant and Ibarra was further established by the recovery of zip ties originating from a common source in Ibarra's garage and defendant's car. Defendant's close affiliation with the Ibarra group was further heightened where, shortly after the Bailey incident, defendant, Ibarra, and Segura were seen leaving Ibarra's house and getting into his vehicle and were together in the car when they were stopped and questioned by the police. That close affiliation continued the day after these murders were committed, when defendant returned to Ibarra's house, engaged with someone in the home, and then, after opening the garage door with a remote garage opener, retrieved a sawed-off shotgun and rifle from Ibarra's garage. Defendant admitted to the police that the weapons were his and that Ibarra let him store his items in Ibarra's garage.

¶ 79    Cell phone records corroborated Foeller's testimony that Butron, Alequin, and Segura intended to engage in another drug deal with Ibarra's crew the night that they were murdered where they established a flurry of phone activity between Butron and Alequin and between Butron and Ibarra before the scheduled drug deal.

¶ 80    The testimony of Special Agent Joseph Raschke placed the phones of Ibarra and Segura in the area of 3100 West 48th Place close in time to when the murders occurred. The cell phone evidence placed defendant's phone in the vicinity of Ibarra's home and 3100 West 48th Place at 6:52 p.m. and established that several hours followed during which defendant did not use his cell phone. The evidence also showed phone calls between defendant and Segura after the murders.

¶ 81    The close affiliation of the Ibarra crew was further reinforced by the testimony of Blanca Dongu, who testified that Segura was her uncle and that defendant, Segura, and Ibarra previously worked together as roofers.

¶ 82    In sum, the evidence clearly allowed a reasonable trier of fact to conclude that the Ibarra crew's common purpose was to sell illegal drugs and that defendant played an essential part in achieving that common purpose. In this regard, we find *People v. Estrada*, 243 Ill. App. 3d 177, 185 (1993), to be factually distinguishable, where the evidence in *Estrada* neither established a common design nor showed that the defendant and his companion acted in concert when the companion shot the victim, whom the defendant had merely meant to intimidate.

¶ 83    Likewise, defendant's reliance on *People v. Johnson*, 2014 IL App (1st) 122459-B, is misplaced, where *Johnson* is factually inapposite. In *Johnson*, the court found that there was no evidence that the defendant knew the shooter was armed and planned to murder the victim or that the defendant intentionally and knowingly acted to facilitate the murder. *Id.* ¶ 156.

¶ 84    Here, the evidence enabled the jury to find that the Ibarra crew had a common plan or design to sell illegal narcotics and that defendant was part of that common plan and accountable for any crimes committed in furtherance of that plan. The evidence in this case, however, went further than to generally establish defendant's close affiliation with a group bent on the illegal sale of drugs, where the implied threat of force at the hands of defendant was conjoined with evidence as to the motive underlying the murders.

¶ 85    Foeller testified that Butron was worried because, on the one occasion when she did not assist Butron, Alequin shortchanged Ibarra what Alequin owed him. Alequin's underpayment provided a motive for the Ibarra crew to kill both Butron and Alequin. The DNA found on the coat with gunshot residue, matching Segura and failing to exclude Ibarra as a possible donor, did not negate evidence establishing defendant's accountability for their actions. For one thing, defendant was the one who carried his sawed-off shotgun and rifle wrapped in that coat from Ibarra's garage to the trunk of his car the day after the murders were committed. For another, one pair of the gloves recovered from the trunk of defendant's car contained a mixture of DNA profiles from which neither Ibarra nor defendant could be excluded. Ibarra could not be excluded from the minor profile.

¶ 86    Foeller's testimony established a base timeline of 9 p.m. for the phone call that preceded Butron leaving their home to meet Ibarra. This initial timeline was further refined by the testimony of Special Agent Raschke and Mr. Fredericks. Special Agent Raschke's testimony regarding the CSLI placed Butron's cell phone moving in the direction of 3100 West 48th Place at 8:54 p.m., when Ibarra called Butron, and again, three minutes later at 8:57, when

Ibarra placed a second call to him. Segura's phone was also in the area of 3100 West 48th Place at 8:58, 9:01, 9:05, and 9:27 p.m. Segura called defendant at 9:48 and 9:51 p.m. and Ibarra at 10:13 p.m., when Segura's phone was again in the vicinity of his home. Defendant's phone was in the vicinity of Ibarra's home at 6:52 p.m. and was inactive until 9:57 p.m., when his phone was in the vicinity of his home at 5631 South Trumbull Avenue.

¶ 87     Mr. Fredericks testified about the video from Mr. Kim's surveillance system that captured images of two vehicles between 9:25 and 9:34 p.m. The image of the vehicle at 9:25 p.m. could not be used to eliminate the digital photo of defendant's car.

¶ 88     In addition to the evidence placing all three offenders at the scene of the murders at the time of their commission, circumstantially, the evidence itself suggested that multiple individuals participated in the acts that caused the death of the victims where, while Romero and Alequin died as a result of multiple gunshot wounds, Butron died as a result of asphyxiation, after being shoved into the trunk of Romero's car.

¶ 89     Perhaps the most damning testimony of all, however, came from defendant's girlfriend, Blanca Dongu, who not only reinforced this narrowed timeline but, inferentially, placed defendant at the scene of the murders at the time of their commission. Dongu testified about defendant's unexplained absence that afternoon and evening, as well as his subsequent actions at around 10 and 11 that evening. Defendant, who was "mad," came home with $4000 in small bills and, in response to Dongu's questions as to the source of the money, told her "not to worry about it." Defendant had Dongu count the money. Defendant then went back outside to his Grand Marquis and retrieved the Ruger Model T-94 semiautomatic pistol, which was wrapped in newspaper and, after placing it in Dongu's hands, proceeded to hide it in their second bedroom. Dongu testified that she had never seen the gun before and was sufficiently concerned about it that she asked the police to remove it from her home.

¶ 90     Defendant later admitted that the gun was his, that it was a recent purchase made for personal protection, and that he never let the firearm out of his house or lent it to anyone else to use. This gun was established to be the murder weapon that killed both Alequin and Romero.

¶ 91     Defendant's possession of the murder weapon and $4000 no more than two hours after this crime was committed, along with other circumstantial evidence that placed him at the scene of the crime during the narrow timeline established by the State, was sufficient to support the jury's verdicts.

¶ 92     In *People v. Garcia*, 2019 IL App (2d) 161112, ¶ 19, the defendant challenged the sufficiency of the evidence to support his first degree murder conviction, maintaining that the State failed to prove his accountability for the actions of his fellow gang members. The court rejected this claim, finding that the evidence supported a conclusion that, before or during the murder and mob action by his fellow gang members, defendant intentionally promoted or facilitated those events by aiding and abetting them. *Id.* ¶ 35.

¶ 93     In *People v. Tarver*, 381 Ill. 411, 415-16 (1942), the supreme court held that, when a group bands together for a limited purpose, "[a] shot fired by one of the defendants, under the circumstances shown, was a shot fired by all and all of them must answer for the result." This continues to be the law when assessing whether the evidence is sufficient to establish accountability based on a common design or plan. *People v. Phillips*, 2014 IL App (4th) 120695, ¶¶ 32-33.

¶ 94    In conclusion, taken as a whole, the evidence was sufficient to support the jury's verdicts.

¶ 95                          B. Proof of Other Crimes

¶ 96    Defendant next alleges that the trial court erroneously allowed excessive proof of both the Butron/Ibarra conspiracy and the McDonald/Bailey/Ibarra conspiracy to be admitted in evidence. Evidence that a defendant has committed crimes other than the one for which he is on trial may not be admitted for the purpose of demonstrating his propensity to commit crimes. *People v. Adkins*, 239 Ill. 2d 1, 22-23 (2010). Such evidence threatens to overpersuade the jury, which might then convict the defendant based on the belief that the defendant is a bad person deserving of punishment. *People v. Lindgren*, 79 Ill. 2d 129, 137 (1980). Evidence of other crimes is admissible, however, if relevant for any purpose other than to show a defendant's propensity to commit crime. *People v. Pikes*, 2013 IL 115171, ¶ 11. The question of relevance turns on whether the evidence has any tendency to make the existence of a fact of consequence more probable or less probable than it would be without the evidence. *People v. Peeples*, 155 Ill. 2d 422, 455-56 (1993); Ill. R. Evid. 401 (eff. Jan. 1, 2011).

¶ 97    Evidence of other crimes is relevant to prove motive, intent, identity, absence of mistake or accident, or *modus operandi*. *People v. McKibbins*, 96 Ill. 2d 176, 182 (1983). It is also admissible to establish the existence of a common plan or design. *People v. Foreman*, 2019 IL App (3d) 160334, ¶ 31. Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) provides that evidence of other crimes, wrongs, or acts may be admissible to establish proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Proof of other crimes may also be relevant to show a continuing narrative where the facts " 'are all a part of the continuing narrative which concern the circumstances attending the entire transaction and they do not concern separate, distinct and disconnected crimes.' " *Adkins*, 239 Ill. 2d at 32 (quoting *People v. Marose*, 10 Ill. 2d 340, 343 (1957)). Evidence of other crimes is also relevant to establish the existence of a conspiracy. *People v. Novotny*, 371 Ill. 58, 61 (1939). Even when other-crimes evidence is offered for a permissible purpose, however, it will be disallowed where its prejudicial impact substantially outweighs its probative value. *People v. Chapman*, 2012 IL 111896, ¶ 19.

¶ 98    The admissibility of evidence is entrusted to the sound judgment of the trial court, whose decision will not be reversed on appeal absent an abuse of discretion. *Pikes*, 2013 IL 115171, ¶ 12. Under this standard, a reviewing court owes some deference to the trial court's ability to evaluate the evidence's impact on the jury. *Foreman*, 2019 IL App (3d) 160334, ¶ 30. Unless the trial court's ruling was arbitrary, fanciful, or unreasonable or no reasonable person would have taken the view adopted by the trial court, the court's ruling will be affirmed. *People v. Braddy*, 2015 IL App (5th) 130354, ¶ 27.

¶ 99    Defendant's argument is grounded in the belief that excessive details of the Butron/Ibarra and McDonald/Bailey/Ibarra conspiracies were admitted in evidence. In considering this claim, we begin by setting out the trial court's thoughtful and extensive findings of record. The trial court made the following evidentiary ruling:

> "THE COURT: Conspiracies are like fish. They come in all shapes and sizes and types. Some conspiracies are—run with the regularity, the efficiency of high level American corporations. A very well-defined precise organizational format where this person is responsible for this, this person is responsible for that. Some of these things

even work in shifts: You've got the day shift, you've got the night shift, you've got the afternoon shift. You go over here and sell drugs at this particular time.

Just because a conspiracy doesn't have a particular rigidity doesn't mean that it's not a conspiracy, where you've got an instance of people who are gathering together with regularity and over a pronounced period of time but for one purpose to transact narcotics for substantial amounts of money and substantial amounts of narcotics. The only reasonable conclusion that can be made is that a conspiracy has been shown.

That's true with respect to the five matters that we're talking about in connection with Foeller and Burton and Ibarra and Mr. Cerda with Mr. Cerda's presence, and also the three instances with respect to Bailey and Ibarra and Mr. Cerda and Mr. McDonald.

What those show is that on each and every occasion—or even if not each and every occasion, but at least with regularity, Mr. Cerda is present with Mr. Ibarra when these transactions are conducted. It just so happens on the night in question, the night in question being May 17, 2010, Mr. Butron evinced to Ms. Foeller, who regularly attended these transactions with him, that he was on his way to a transaction with Ibarra.

Everybody can reasonably anticipate, or at least it's not unreasonable to conclude that perhaps Mr. Cerda would be there. Although ordinarily Ms. Foeller would go to those transactions, according to her claim, and again, I stress that I'm not accepting her representations as truthful, I'm accepting, though, the fact that she makes those representations, and I'm accepting the State's belief that she will come in to court and testify in that regard. Whether the fact-finder believes that or not, that's up to the fact-finder, not up to me, unless, of course, I am the fact-finder, but that's not up to me either.

The fact that these transactions get conducted in this manner and the fact that Mr. Cerda is present in virtually every seeming instance in connection with them, tends to, therefore make it more likely and thus relevant that he would have been there on May 17th or perhaps into the morning of May 18th, some point before these three persons were found murdered in the manner in which they were.

Rule 404—case law preceding Rule 404 and for that matter following Rule 404 discusses all sorts of things: modus operandi, opportunity, absence of mistake, intent, identity, and those are very helpful, but the fact of the matter is, and what it all boils down to, and it's actually—it is stated somewhat succinctly at the end of the State's motion, whether you call these practices system of opportunity, routine, custom and usage, whatever you call it, it still establishes that Mr. Cerda with regularity acted as the watchdog, and it raises the inference and makes it more likely and therefore relevant that Mr. Cerda was with Ibarra at the time these persons were supposed to meet Ibarra, which not coincidentally if all this is to be believed, is the time in which these persons were killed.

Together with all the other evidence that has been described for me that the State seeks to adduce in this case, it raises the inference that Mr. Cerda was present at the time these persons were killed. It doesn't necessarily prove it with certainty or beyond a reasonable doubt, but it doesn't have to in order to permit its admissibility, its admission.

At the same time, I'm appreciative of the fact that this evidence has the potential to have prejudicial effect as to Mr. Cerda. The fact, in my estimation, that someone engages even with some regularity in these particular types of narcotics transactions does not lead appreciably in weighing the probative value versus the prejudicial effect in leading me to conclude that the fact-finder is going to be—that there will be a real and substantial danger that the fact-finder will say well, he must have done these three murders because he did these—he was present for these eight drug deals. I just don't see that happening.

Consequently, in the weighing of the probative value versus the prejudicial effect, I'm going to grant the State's motion and permit them to put in this evidence regarding these other crimes. And I'm also for very similar reasons going to permit them to put in these co-conspirator statements from Foeller, perhaps Foeller testifying regarding what the now-deceased Mr. Butron said, and what Mr. McDonald can testify to with respect to what Bailey said and what perhaps Ibarra said in connection with what are clearly to me circumstances over a regular period of time in which these narcotics transactions are conducted shows a conspiracy.

It shows an agreement amongst three persons to do this with regularity. Maybe not with clockwork, maybe not every Friday night at 6:00 or every Tuesday morning at 8:00 a.m., but with regularity and under such circumstances that it shows a degree of regularity bespeaking a conspiracy and an agreement amongst these persons to conduct themselves in these criminal enterprises in that matter.

So I'm also going to permit the State to put in the co-conspirator statements from— through Foeller and McDonald both regarding what Foeller and McDonald said, and also what Butron, Bailey, and Ibarra, to the extent those could be testified to by Foeller and McDonald."

¶ 100    The trial court's ruling constituted a proper exercise of discretion. While defendant claims that excessive details regarding the two conspiracies were admitted at trial, defendant does not contest the trial court's finding that the evidence supported the existence of two separate conspiracies. The trial court's ruling was correct where, in Illinois, even if conspiracy is not charged, when a crime is committed in pursuance of a conspiracy, evidence of that conspiracy, including every act of the conspirators is admissible, even though the commission of other crimes is disclosed. *Novotny*, 371 Ill. at 61. In *Novotny*, the defendant was convicted of injuring and defacing a building and some of its contents. *Id.* at 60. On appeal, he contended that evidence of other crimes was improperly admitted and that even if admissible, excessive details were improperly admitted at trial. *Id.* at 61. Our supreme court disagreed, holding:

"The general rule is that evidence of offenses other than the one charged in an indictment is inadmissible. When, however, the crime charged has been committed in pursuance of a conspiracy, even though the indictment does not charge conspiracy, it is competent to show that the crime committed was the result of a conspiracy and every act of the conspirators is admissible, even though the commission of other crimes is disclosed. Proof of such other crimes may tend to prove intent, motive or a common design." *Id.*

¶ 101    This general rule was reiterated in *People v. Trigg*, 97 Ill. App. 2d 261 (1968). In *Trigg*, the defendant alleged, *inter alia*, that statements made by his codefendant as well as drug sales

conducted outside of his presence were improperly admitted at trial. *Id.* at 270-71. The court disagreed, finding:

> "The essence of the State's case against the defendant lay in the proof of a partnership existing between him and Bratu for the purpose of selling a purported narcotic, with the defendant as the supplier and Bratu as the party responsible for finding prospective customers. Where the proof of a conspiracy depends upon isolated acts and events the acts of one of the conspirators may be admitted in evidence before sufficient proof of the conspiracy has been given pending the future production by the State of adequate evidence to show the conspiracy's existence." *Id.* at 272 (citing *Spies v. People*, 122 Ill. 1 (1887)).

Relying on *Novotny*, the court concluded that, where the State's evidence established the existence of a conspiracy between defendant and his codefendant, any acts in furtherance of the common purpose of the conspiracy were admissible against defendant. *Id.* at 273.

¶ 102 Both the Butron/Ibarra conspiracy and the McDonald/Bailey/Ibarra conspiracy involved the illegal sale of drugs and were admissible in their entirety under *Novotny*. Evidence of the conspiracies established that defendant was part of the conspiracies and the unique role that he played in the conspiracies, both which were relevant to establish his accountability for the murders.

¶ 103 Additionally, evidence pertaining to the conspiracies was relevant for a multitude of other reasons where it tended to establish motive, common plan or design, intent, and identity. Particularly instructive is the case of *People v. Johnson*, 368 Ill. App. 3d 1146 (2006), a case in which other-crimes evidence was also admissible on multiple bases.

¶ 104 In *Johnson*, the trial court admitted proof of other shootings that occurred on the same day that the victims were shot and other acts allegedly committed by the defendant in retaliation for the death of someone close to him. The court considered the admissibility of the evidence under the exceptions for continuing narrative, common scheme or design, motive, intent, and identification.

¶ 105 The court found that the other-crimes evidence was admissible under the continuing-narrative exception where, without such evidence, the crime was inexplicable and would leave the State with no theory as to why the defendant attacked the victims. *Id.* at 1156. The evidence was also admissible under the exception for common scheme or design, where it supported the State's theory that the defendant was involved in a larger overall scheme or design to avenge the death of the person who was close to him. *Id.* at 1156-57.

¶ 106 The court also found the other-crimes evidence relevant to show both the defendant's motive and intent to commit the crimes. *Id.* at 1157. Finally, the court found the evidence admissible to establish the defendant's identity. *Id.* at 1158.

¶ 107 In this case too, the other-crimes evidence was relevant for multiple reasons, beginning with common design or plan. Evidence of a common plan or design proves the existence of a larger criminal scheme of which the crime charged is only one element. *Id.* at 1156. For the exception to apply, there must be some degree of identity between the facts of the crime charged and those of the other offenses in which the defendant was involved. *People v. Spyres*, 359 Ill. App. 3d 1108, 1113 (2005). The existence of factual similarities between the crimes does not necessarily establish that the crimes were committed as a part of a common design,

scheme, or plan. *Johnson*, 368 Ill. App. 3d at 1156. Rather, the focus should properly be directed to defendant's state of mind or purpose in committing the offenses. *Id.*

¶ 108     In this case, the common design of the Ibarra crew was the illegal sale of drugs. Defendant was part of the common design and played a unique role, that of "watchdog." McDonald testified that Ibarra told him, essentially, that defendant's role was that of enforcer should something go wrong. This testimony established both common design or plan and intent, where the common design or plan of selling drugs was accompanied by an implied threat of force at the hands of defendant. Testimony of the common design or plan was ultimately relevant to establish defendant's presence at, and accountability for, the murders.

¶ 109     Additionally, Foeller's testimony about the Butron/Ibarra conspiracy was relevant to establish the Ibarra crew's motive for murdering the victims. While the State is not required to prove motive, it is entitled to do so when evidence of motive exists. *Id.* at 1157. Foeller recounted how Butron told her about Alequin shortchanging Ibarra on Alequin's most recent purchase. Butron was worried about this, and with good reason, where on the date of the very next intended exchange, Butron, Alequin, and Romero wound up murdered.

¶ 110     The other-crimes evidence also tended to show defendant's identity. Proof of other crimes may be admitted to show identity or to bolster a victim's identification of a perpetrator. *Id.* at 1158. Here, defendant's identity was at issue, where defendant was never introduced to Foeller or McDonald by name. The civilian and police testimony alike tended to establish defendant's identity.

¶ 111     Finally, we note that police testimony regarding the stop of Ibarra, Segura, and defendant on April 23, 2010, as well as the surveilling of Ibarra, was relevant to show the sequential steps taken in the investigation of this crime. Evidence of other crimes is admissible to explain the course of a police investigation into a crime, and the events leading up to an arrest are relevant when necessary and important to a full explanation of the State's case. *People v. Johnson*, 114 Ill. 2d 170, 194 (1986); *People v. Gonzalez*, 379 Ill. App. 3d 941, 950 (2008). Where the testimony is necessary and important to a full explanation of the State's case and is presented for a purpose other than to show defendant's propensity to commit crime, it may be admitted. *People v. Jackson*, 232 Ill. 2d 246, 268 (2009). This is so even though the testimony may allow the jury to infer prejudicial prior criminal activity. See *People v. Lewis*, 165 Ill. 2d 305, 345-47 (1995).

¶ 112     In *Johnson*, police testimony about an unrelated incident that ultimately led to defendant's identification and arrest were found to be properly admitted to rebut a suggestion that the police unjustifiably targeted defendant eight months after the offenses occurred. *Johnson*, 114 Ill. 2d at 193-94.

¶ 113     In *Jackson*, the court held that police testimony explaining how the defendant came to be identified as the source of DNA recovered at the crime scene was properly allowed. *Jackson*, 232 Ill. 2d at 265.

¶ 114     In *Gonzalez*, the court held that police testimony about actions taken by them in investigating the victim's death was properly admitted to explain the course of the police investigation and those events that led to the defendant's arrest. *Gonzalez*, 379 Ill. App. 3d at 950.

¶ 115     Here, in deciding the admissibility of the police testimony, the court ruled that the State would be permitted to "show why the police centered on a particular individual." We conclude

that, under *Jackson*, *Gonzalez*, and *Johnson*, the sequential steps in the investigation were both relevant and admissible.

¶ 116    We disagree with defendant's contention that the testimony regarding the Bailey investigation allowed the jury to conclude that Ibarra, Segura, and defendant murdered the Bailey brothers and Crawford Davis. In point of fact, the trial court expressly disallowed the State from admitting evidence concerning these murders when it denied the State's motion to admit such evidence as proof of *modus operandi* and defendant did not allege that this ruling was violated by the State. Nor did the State either explicitly or impliedly inform the jury that the Bailey brothers and Crawford Davis had died. The State proceeded cautiously, specifically telling the jury in closing argument that "it would be a violation of the oath that you took" for them to consider such evidence for anything other than the limited bases for their admission. Also, the trial court gave a limiting instruction informing the jury of the limited use of the other-crimes evidence. Standing alone, we cannot conclude that McDonald's testimony that he never saw the Bailey brothers again, would lead the jury to conclude that the Ibarra crew committed another, unrelated triple murder in addition to the one for which he stood trial.

¶ 117    Defendant misplaces reliance on *People v. Nunley*, 271 Ill. App. 3d 427 (1995), *People v. Bedoya*, 325 Ill. App. 3d 926 (2001), *People v. Richee*, 355 Ill. App. 3d 43 (2005), and *People v. Thigpen*, 306 Ill. App. 3d 29 (1999), to support his claim that this case devolved into two mini-trials on the other-crimes evidence. None of defendant's cases involve other-crimes evidence admitted to establish a conspiracy, and even if the other bases for admitting the other-crimes evidence are considered, these cases are distinguishable.

¶ 118    In *Nunley*, extensive other-crimes evidence that the defendant was arrested for stabbing his mother and killing her dog at the time that he confessed to the robbery and murder for which he stood trial was found to exceed the "continuing narrative" basis for the admission of other-crimes evidence. *Nunley*, 271 Ill. App. 3d at 432. Here, the police testimony fell under several exceptions in addition to the "continuing narrative" exception. Testimony regarding their investigative activities in surveilling the Ibarra crew fell squarely within the continuing narrative exception.

¶ 119    In *Bedoya*, on retrial, the State presented excessive evidence of the defendant's firing of a gun from a car at three buildings less than an hour before the murder. *Bedoya*, 325 Ill. App. 3d at 927. The court found that the evidence was not relevant where it bore no threshold similarity to the crime charged. *Id.* at 938-39. Additionally, the court found that any potential relevance was overcome by the unfair prejudice that resulted from the introduction of excessive details that were unrelated to prove the defendant's intent and absence of mistake. *Id.* at 940-41.

¶ 120    In *Richee*, at the defendant's murder trial, extensive evidence concerning two prior burglaries was admitted under a theory of *modus operandi*. *Richee*, 355 Ill. App. 3d at 50. The court found that the similarities among the crimes were insufficient to permit their admission at trial. *Id.* at 57-58. Further, the court found that the probative value of such evidence was outweighed by its prejudicial effect where the admission of such testimony permitted the State to present two trials within a trial. *Id.* at 58.

¶ 121    In *Thigpen*, the court held that photographs of the victims' corpses from a previous double murder were erroneously admitted as proof of other crimes to show a common plan or scheme. *Thigpen*, 306 Ill. App. 3d at 38-39. Here, as was previously discussed, the jury was not told that Crawford Davis or the Bailey brothers were killed.

¶ 122    Here, the other-crimes evidence was not admitted to show *modus operandi*, nor did the trial court allow an impermissible mini-trial on wholly separate offenses. While a trial court must guard against the evidence of other-crimes evidence creating a minitrial on the other offense (*People v. Davis*, 2019 IL App (1st) 160408, ¶ 67), here, the other-crimes evidence did not transgress the general prohibition against the admission of other-crimes evidence where it fell within the exceptions for conspiracy, common design or plan, motive, identity, intent, and course of the police investigation.

¶ 123    As we decline to find that the trial court's rulings were erroneous, we need not reach the question of harmless error. *People v. Jackson*, 203 Ill. App. 3d 1, 14 (1990). We conclude that the trial court's rulings constituted a proper exercise of its discretion.

¶ 124                                    C. Ineffective Assistance of Counsel

¶ 125    Defendant's final claim of error alleges that he was deprived of the effective assistance of counsel because his attorney failed to move to suppress CSLI related to his phone. Under the familiar test set forth in *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 525 (1984), in order to prevail, defendant must establish that (1) counsel's conduct was objectively unreasonable given the state of the law at the time the suppression motion would have been filed and (2) a reasonable probability that, but for the unprofessional performance, the outcome would have differed. *People v. Henderson*, 2013 IL 114040, ¶¶ 11, 15; *People v. Cherry*, 2016 IL 118728, ¶ 24. To establish deficiency, defendant must overcome the strong presumption that the challenged inaction might have been the result of sound trial strategy. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). Failure to satisfy either prong of *Strickland* will defeat an ineffective assistance of counsel claim. *Henderson*, 2013 IL 114040, ¶ 11.

¶ 126    Under the first prong of *Strickland*, representation will not be deemed deficient based on a hindsight analysis. *People v. Oliver*, 2013 IL App (1st) 120793, ¶ 24; *People v. English*, 2013 IL 112890, ¶¶ 33-35. To establish prejudice, defendant most show that the suppression motion would have been granted as well as a reasonable probability that the outcome of the trial would have differed had the evidence been suppressed. *Henderson*, 2013 IL 114040, ¶ 15. Put differently, defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *People v. Evans*, 186 Ill. 2d 83, 93 (1999). A reviewing court need not consider whether counsel's performance was deficient if it determines that defendant has failed to demonstrate prejudice. *People v. Givens*, 237 Ill. 2d 311, 331 (2010).

¶ 127    We begin by noting what is *not* being challenged, *viz.*, evidence pertaining to cell phone calls placed from and received by the phones associated with Ibarra, Segura, defendant, and Butron, as well as CSLI for Ibarra, Segura, and Butron. Thus, the focus of our inquiry is narrow and concerns whether trial counsel's failure to move to suppress evidence of defendant's CSLI constituted ineffective assistance of counsel.

¶ 128    Our consideration of this claim properly begins with a discussion of the evidence. The CSLI adduced at trial placed defendant's phone in the general vicinity of Ibarra's home and 3100 West 48th Place at 6:52 p.m. on May 17, 2010. It also established that defendant's phone was in the area of his own home at 5631 South Trumbull Avenue at 9:57, 10:02, 10:04, 10:06, and 10:12 that evening. The failure to seek suppression of this evidence did not constitute

deficient performance by defense counsel, nor did it result in prejudice such that, if suppressed, the outcome of the trial would have differed.

¶ 129      Our conclusion is based, in part, on a recent decision from another division of this court. *People v. Minkens*, 2020 IL App (1st) 172808. In *Minkens*, the defendant appealed his convictions for first degree murder and intentional homicide of an unborn child conviction and alleged that he was denied effective assistance of counsel, where his attorney failed to move to suppress CSLI that was obtained without a warrant. *Id.* ¶¶ 1-2. As in this case, defendant relied on the United States Supreme Court's decision in *Carpenter v. United States*, 585 U.S. ___, ___, 138 S. Ct. 2206, 2219-20 (2018), wherein the Supreme Court held a person has a legitimate expectation of privacy in his CSLI records and that law enforcement's collection of such information constitutes a "search" under the fourth amendment. *Minkens*, 2020 IL App (1st) 172808, ¶ 19.

¶ 130      The court rejected the defendant's claim because *Carpenter*, which was decided in 2018, was not the law when the defendant's case was pending in the trial court, declining to "find counsel's failure to predict the future holding in *Carpenter* ineffective." *Id.* ¶ 20. The court concluded that while, pre-*Carpenter*, trial counsel could have moved to suppress the defendant's CSLI, the failure to do so was not objectively unreasonable. *Id.* ¶ 22. Moreover, the court found that the defendant failed to establish resulting prejudice, where the suppression of his CSLI would not have altered the outcome of the case since the defendant's whereabouts could have been independently established without the CSLI. *Id.* ¶ 23.

¶ 131      *Minkens* does not stand alone in rejecting a defendant's claim of ineffective assistance of counsel based on trial counsel's failure to move to suppress CSLI pre-*Carpenter*. In *People v. Herring*, 2018 IL App (1st) 152067, ¶ 100, the court disposed of a similar claim to that raised in *Minkens* by focusing only on the defendant's failure to establish resulting prejudice. The court concluded that suppression of such evidence would not have altered the outcome where the evidence was consistent with the defendant "minding his own business at home" since the defendant lived near the crime scene. *Id.*

¶ 132      Also, in *People v. Strickland*, 2019 IL App (1st) 161098, ¶¶ 1, 3, the defendant, who was convicted of first degree murder and solicitation of murder for his role in the death of his grandfather, alleged, among other things, that the trial court erroneously denied his motion to suppress CSLI for his grandmother's phone, obtained pursuant to a grand jury subpoena. The court declined to consider whether the exclusionary rule or the good-faith exception applied to the facts of the case, instead resolving the issue by finding any error to be harmless where it would not have altered the outcome of the defendant's trial. *Id.* ¶ 68.

¶ 133      Based on *Minkens* and *Herring*, we find that defendant has failed to satisfy either prong of *Strickland*. As in *Minkens*, where the defendant's CSLI was collected and the case tried pre-*Carpenter*, we believe that trial counsel should not be branded incompetent for failing to divine a change in the law. In this regard, we note that the record affirmatively shows zealous advocacy on the part of seasoned trial counsel, who successfully opposed multiple motions by the prosecution, including a joinder motion and a motion to admit the previous triple homicide under the *modus operandi* exception to the general prohibition against evidence of other crimes. This record disallows us from concluding that defense counsel's failure to file this motion can be properly viewed as deficient. Additionally, for reasons which we will address shortly, defense counsel's failure to file this motion may properly be regarded as trial strategy,

where counsel could have reasonably believed that the filing of such a motion would have been a futile act.

¶ 134     Even if we accept, however, that reasonably competent counsel should have moved to suppress defendant's CSLI, as in *Herring*, we would still decline to find resulting prejudice where, as defense counsel recognized, such evidence hardly presented compelling proof of defendant's guilt. Unlike the CSLI for Ibarra and Segura, at most, the CSLI evidence for defendant suggested that, hours before the murders, defendant was in the general area of Ibarra's home and was later in the vicinity of his own home. That evidence, taken in conjunction with the non-use of defendant's phone for three hours that evening arguably supported defendant's claim that he was not present when the murders were committed.

¶ 135     At most, admission of the CSLI was harmless where it was cumulative to Dongu's highly probative testimony that defendant's unaccounted-for disappearance and subsequent return home between 10 and 11 that evening was accompanied by his possession of what would turn out to be the murder weapon in hand. In light of the substantial evidence produced at trial, we cannot say that exclusion of defendant's CSLI would have altered the outcome of this case.

¶ 136     Finally, to the extent that defendant claims that the "necessary principles upon which he should have sought suppression of Cerda's location information" were decided pre-*Carpenter*, defendant's claim is severely undercut by a case that the State sought leave to cite as additional authority, and which we allowed, *People v. Potts*, 2021 IL App (1st) 161219. In *Potts*, in deciding whether CSLI evidence was erroneously admitted at trial in violation of *Carpenter*, the court engaged in a detailed discussion of United States Supreme Court precedent. *Id.* ¶¶ 97-101. In assessing the state of the law governing the admission of CSLI evidence pre-*Carpenter*, the court noted:

> "But whatever qualms they may have had, lower courts 'do not write on a blank slate'; they are bound to follow existing Supreme Court precedents and doctrines until instructed otherwise by the Supreme Court itself. *Thompson*, 866 F.3d at 1154. And before *Carpenter*, every federal court of appeals (and as far as we know, every state reviewing court) held that the warrantless collection of CSLI was consistent with existing fourth amendment doctrine. *Id.* at 1155-57; *United States v. Graham*, 824 F.3d 421, 426 (4th Cir. 2016) (*en banc*); *Carpenter*, 819 F.3d at 889 (majority opinion); *United States v. Davis*, 785 F.3d 498, 511 (11th Cir. 2015) (*en banc*); *In re Application of the United States for Historical Cell Site Data*, 724 F.3d 600, 611-13 (5th Cir. 2013). Specifically, the consensus view was that the Supreme Court's 'third-party doctrine' permitted this practice." *Id.* ¶ 96.

¶ 137     While agreeing that, under *Carpenter*, a warrant was required in order to lawfully obtain the defendant's CSLI, the court determined, in accordance with the rule announced in *Davis v. United States*, 564 U.S. 229, 232 (2011), and adopted by the Illinois Supreme Court in *People v. LeFlore*, 2015 IL 116799, ¶ 27, that the good-faith exception to the exclusionary rule applied. *Potts*, 2021 IL App (1st) 161219, ¶ 131.

¶ 138     Under *Potts*, defense counsel's failure to file a motion to suppress the CSLI evidence can be viewed as a reasonable exercise of trial strategy, where such filing could have reasonably been viewed as a futile act. Counsel cannot be ineffective for failing to make a futile motion. *People v. Holmes*, 397 Ill. App. 3d 737, 741 (2010). Likewise, under *Potts*, defendant fails to demonstrate resulting prejudice, where, arguably, the good-faith exception would have similarly prevented application of the exclusionary rule to this case as well.

¶ 139    In conclusion, defendant has failed to establish that he was denied effective assistance of counsel where his attorney's failure to file such motion was neither deficient nor resulted in prejudice to him.

¶ 140                                    III. CONCLUSION

¶ 141    For the foregoing reasons, we affirm the circuit court's judgment.

¶ 142    Affirmed.