2022 IL App (1st) 200635

FIRST DISTRICT
SIXTH DIVISION
January 7, 2022

No. 1-20-0635

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 16 CR 15404 |
| | ) | |
| FLORIN MULOSMANI, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justices Mikva and Oden Johnson concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a jury trial, defendant Florin Mulosmani was convicted of first degree murder and sentenced to 40 years' imprisonment. On appeal, defendant contends that the trial court erred in admitting (1) evidence that, prior to the instant offense, codefendant fired a gun from a car defendant was driving and (2) codefendant's hearsay statements as evidence of defendant's consciousness of guilt. He also contends that the evidence was insufficient to convict him of first degree murder beyond a reasonable doubt and that the State misstated the law in closing arguments. For the reasons stated below, we affirm.

¶ 2                                    I. JURISDICTION

¶ 3 On May 8, 2019, a jury found defendant guilty of first degree murder. The court sentenced him to 40 years' imprisonment on February 28, 2020, and he filed his notice of appeal that day. Thus, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill.

Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. Mar. 12, 2021), governing appeals from a final judgment of conviction in a criminal case.

¶ 4                                   II. BACKGROUND

¶ 5      Defendant and codefendant Rashid Mujkovic were charged with the first degree murder of Damien Cionzynski while armed with a firearm and the attempted armed robbery of Mateusz Handley, allegedly committed on or about May 28, 2016. One first degree murder charge alleged felony murder based on attempted armed robbery. Codefendant was also charged with first degree murder with the allegation that he personally discharged a firearm proximately causing death.

¶ 6      The State tried defendant for first degree murder on theories of intentional murder, strong probability of death or great bodily harm, and felony murder based on attempted armed robbery. Defendants had simultaneous trials, defendant by jury and codefendant by the trial court.

¶ 7                                   A. Motions *In Limine*

¶ 8      During motions *in limine*, the State sought to admit coconspirator statements against defendants. In the motion, the State alleged a chain of events preceding and including the charged offenses to establish context for the alleged coconspirator statements. At about 2:30 a.m., defendants were in a car with Tisa Rodriguez, with defendant driving. Defendants yelled at people crossing the street, then codefendant shot at them and hit one. Defendant drove near Rodriguez's home and said that he did not want to drive around with the gun. Codefendant handed defendant the gun, and he went into an alley, returning to the car without the gun. However, just before they were about to pick up Amanda Duran, codefendant told defendant that they had to go back for the gun and that codefendant wanted to reload it. After picking up Duran, defendants returned for the gun and drove on. During the drive, codefendant fired the gun several times into the air. Duran

was upset by this and briefly left the car before defendant coaxed her back. At about 5 a.m. Cionzynski and Handley were in a gasoline station when defendants arrived there. After defendants entered with Rodriguez and Duran outside, codefendant displayed a gun while defendant searched Handley's pockets and told him to give up his property. When Handley pushed defendant's hand away, defendant punched him in the face. Defendant then searched Cionzynski's pockets and struck him, and when he resisted, codefendant shot him. Rodriguez and Duran heard the gunshots. Defendants fled in the car with Rodriguez and Duran.

¶ 9     The alleged coconspirator statements were then made in the car. Duran recorded codefendant telling defendant that they had to leave the area quickly. Defendant remarked that he hurt his hand striking two men inside the gasoline station. Codefendant told defendant that he wanted to take Rodriguez and Duran to the woods, which Duran took to mean that he wanted to kill them. Defendants drove Rodriguez and Duran to Rodriguez's home, and defendant told her to pack. Defendants said that they were leaving the state, and defendant told Rodriguez that codefendant planned to kill Duran in the home. Rodriguez wept, and defendant told her that codefendant would kill her as well if she continued to cry. Codefendant told defendant to "do it," which Rodriguez took to mean killing Duran immediately. Duran fled during this conversation, and codefendant told defendant that they had to find her. They went back to the car but did not find Duran. Defendant drove to codefendant's home, where defendants discussed the murder and leaving the area, including codefendant suggesting burning the car. Rodriguez saw codefendant cleaning the gun. Defendants learned that police were seeking codefendant. Codefendant told a man Rodriguez knew as "White Boy" to "grab all his ammo," as codefendant did not want anything incriminating in his home if police came there.

¶ 10    The State argued that the various statements by defendants demonstrated a conspiracy between them and were made in the course of that conspiracy. A conspiracy can be shown by inference from circumstantial or direct evidence, including the acts and declarations of the participants in the conspiracy, the State argued.

¶ 11    Following arguments by the parties, the court granted the motion in part. The court allowed the statements to be used to show consciousness of guilt by flight and "trying to eliminate some witnesses" and evidence. However, they would not be admitted as evidence of a conspiracy because they did not include "an agreement to do certain things together."

¶ 12    The State also sought to introduce other-crimes evidence against defendants: specifically, that witnesses saw defendants with a gun, codefendant fired that gun out of a car window, and codefendant was seen with the same gun after the charged offenses. The State argued that this evidence was part of a continuing narrative with the charged offenses and demonstrated defendant's knowledge that codefendant had a loaded gun before the charged offenses.

¶ 13    During arguments, the defense argued that the evidence would be more prejudicial than probative, as it had "nothing to do with what happened in that gas station" and Duran could testify to the gun. The State told the court that it would not use the first shooting where someone was shot against defendant and the jury would not hear evidence of that shooting. The court found the remaining evidence—defendants hid a gun, then retrieved and reloaded it, and codefendant fired it into the air as defendant drove—admissible to show defendant's knowledge that codefendant had an operable firearm. The court also found the evidence to be "part and parcel of the same course of conduct" of "meandering around" with the gun and killing with it. The incident where someone was shot would be excluded as to defendant unless he opened the door by testifying.

¶ 14                              B. Trial Evidence

¶ 15                                 1. Handley

¶ 16    Handley testified that he and Cionzynski were friends for many years and saw each other nearly every day. Late on May 27, 2016, they were drinking together in a bar and then at Cionzynski's home. At about 5 a.m. on May 28, they walked to a gasoline station to buy cigarettes. When they entered, Handley saw defendants; the station clerk was also present in his bulletproof booth. "[T]hey asked me what's in my pockets and I just told them nothing and they—one of them just started patting me down." Handley clarified that defendant, "the one in the red shirt in the video" from the station, frisked him. Defendant asked Handley what he had in his pockets, then started searching his pockets. When Handley grabbed defendant's hand and pushed it away, codefendant "flashed a gun at me" from his pocket and waved it so that Handley noticed it. As this was occurring, Cionzynski was buying cigarettes from the clerk. After Handley pushed defendant's hand away, defendant punched him. "I guess [Cionzynski] ended up punching him back, then after all I remember is him getting shot in the head." Though defendant punched him, Handley was focused on codefendant, who had a gun. Once Cionzynski was shot, Handley focused on applying first aid rather than watching where defendants went beyond noticing that they left.

¶ 17    The parties stipulated to security video of the incident, which was played at trial. Handley pointed to himself and Cionzynski in the video wearing a white shirt and gray shirt respectively, to codefendant wearing a black shirt, and to defendant in a red shirt. Handley shook defendant's hand because he looked familiar. Handley noted video of defendant grabbing his pocket and noted a still picture from the video showing defendant indicating the gun in codefendant's pocket.

¶ 18    After the incident, Handley spoke with police. He was shown an array of photographs after reviewing and signing an advisory form, and he identified defendant as the man in red from the incident. In September 2016, he viewed a lineup, again after reviewing and signing an advisory form, and identified codefendant as the shooter in black.

¶ 19    On cross-examination, Handley testified that he and Cionzynski both drank a significant amount of beer on the night in question from about 8 p.m. until the time of the incident about 5 a.m. He acknowledged that Cionzynski was intoxicated and he was "pretty tipsy" himself. He reiterated that defendants were already inside the gasoline station when he and Cionzynski arrived. He recognized defendant and had no previous trouble with him, and Handley shook his hand and smiled at him. However, defendant then asked him if he had anything in his pockets to give defendant. While nobody announced a robbery, "stickup," or the like, codefendant "merely pulled a gun out," and Handley inferred it was a robbery. When asked if defendant had his back to codefendant when the latter showed the gun, Handley testified that defendant looked at the gun, turned to Handley, and smiled. Defendant reached into Handley's pockets but did not remove anything because "I didn't give him a chance." Handley did not flee because codefendant was armed. When he saw the gun, he did not point it out to Cionzynski, whose attention was on the clerk. Cionzynski was behind Handley, and Handley did not believe he saw the gun.

¶ 20    On redirect examination, Handley clarified that, before the incident, he had not seen defendant in person but only online. Defendant had pointed out codefendant's gun to Handley, and video to this effect was shown at trial. While Handley did not flee when he saw the gun, he did move in front of Cionzynski, that is, between the gun and Cionzynski.

¶ 21                                    2. Syed Ali

¶ 22    Gasoline station clerk Syed Ali testified that he was in his locked bulletproof booth on the night in question when Handley and Cionzynski entered the station to buy cigarettes. Ali had seen both men previously, with Cionzynski being a "regular," and had no trouble with them. Just before they arrived to make their purchase, two other men arrived. The small man came into the store, while the other man with a ponytail stood just outside and put his fingers in his mouth as if to induce vomiting. The small man pointed out the ponytailed man and suggested that Ali chase away the man vomiting in the station. Ali declined, afraid to exit his booth because the two men "look[ed] like bad guys." The small man then yelled and cursed at Ali in apparent frustration, but Ali would still not leave his booth. The ponytailed man then joined the small man, and they walked toward Handley and Cionzynski. The ponytailed man no longer appeared ill. At first the four men were talking and shaking hands, but then the ponytailed man was "asking victim" for cigarettes or money and "touching his pocket." When "the victim" said he had nothing, "then this ponytail guy start[ed] punching" Handley and then Cionzynski. Cionzynski tried to defend himself by shoving the ponytailed man, but the small man shot him. Ali heard but did not actually see the shooting, and he saw Cionzynski fall to the floor with a bleeding head wound. Ali called the gasoline station manager and then 911. The small man and ponytailed man fled, and Handley yelled for help.

¶ 23    The station security video was shown at trial. Ali pointed out the small man arriving at the station and trying to induce him to leave his booth, then Handley and Cionzynski arriving, and then the ponytailed man. He never saw the small man or the ponytailed man before the incident.

¶ 24    Ali spoke with police after the incident. He viewed two photographic arrays after reading and signing an advisory form. From one array, he identified a man as the ponytailed man in a red

shirt who punched Handley and Cionzynski and marked that man's photograph. From the other array, he identified another man as the small man in a black shirt from the incident and marked that man's photograph. He later viewed the security video and saw a gun in the small man's pocket. When asked if he saw either the small man or ponytailed man in court, he said he did not see them.

¶ 25    On cross-examination, Ali testified that he believed the small man and the ponytailed man were trying to rob him, and that is why he called them "bad people." However, he did not call 911, nor did he warn Handley or Cionzynski. His view from the booth was not severely restricted, but it was obstructed enough that he did not see the shooting occur. He could not hear what was going on outside the booth and thus never heard the ponytailed man ask for cigarettes from or threaten Handley or Cionzynski. He saw the ponytailed man reach into Cionzynski's pockets, rather than Handley's pockets, and did not see him remove anything from a pocket.

¶ 26    On redirect examination, Ali testified that he regretted not calling 911 earlier. While he was afraid when he first met with police, he was not afraid as he testified at trial.

¶ 27    On recross examination, Ali clarified that he did not notice a gun in the small man's pocket during the incident but only when viewing the security video later. On redirect examination, he added that he could not have seen the small man's pockets from inside his booth.

¶ 28                              3. Security Video

¶ 29    The security video from the gasoline station is silent and from various cameras.

¶ 30    One video shows codefendant in front of the clerk's booth inside the station building, pointing toward one door and then walking out of view. Moments later, Handley and Cionzynski respectively enter by the opposite door, followed by defendant entering view from the other direction. Handley shakes hands with defendant, then the three men stand and interact for a few

moments, and then Cionzynski steps in front of the booth to make a purchase while Handley stands close behind him. Defendant stands just out of camera view until a scuffle breaks out between defendant and Handley. Cionzynski turns to face defendant, who strikes him. Cionzynski lunges toward defendant but then falls to the floor and does not move again. Defendant is not seen again, and Handley uses his cell phone.

¶ 31    Another video shows the interaction between defendant, Handley, and Cionzynski from an angle where defendant is in camera view with his back to the camera. Defendant and Handley are interacting until defendant shoves or strikes Handley, who steps back. Codefendant moves to be closely behind defendant, who then strikes Cionzynski. Cionzynski lunges toward defendant before falling to the floor and not moving again.

¶ 32    Another video shows codefendant enter the station, wander for a few moments, stand directly in front of the booth, and gesture for a few moments, followed by defendant entering the building and wandering. After another few moments, defendant interacts with someone just out of camera view, including visibly laughing. During this interaction, at least one of defendant's hands is out of view. Codefendant, standing a few feet behind defendant, briefly and partially pulls an object out of his right pants pocket. A short time later, defendant points to codefendant behind him, who again places his hand on the object in his right pocket. After a few more seconds defendant strikes someone out of view. Cionzynski then comes into camera view struggling with defendant before codefendant draws a dark pistol from his right pants pocket and points it at Cionzynski, who falls to the ground. He lies unconscious and bleeding profusely on the floor as defendants exit the building and Handley attends to Cionzynski and uses his cell phone.

¶ 33    Yet another video shows police arriving at the gasoline station and Handley interacting with them before sitting down with his head in his hands.

¶ 34                                      4. Rodriguez

¶ 35    Rodriguez testified that defendant, nicknamed "Block," had been her boyfriend for about five or six years "on and off" and he lived with her and her son until 2016. Codefendant was one of defendant's best friends. Rodriguez owned a silver Saturn in 2016. At about 2 a.m. on May 28, 2016, she was in her car with defendant driving and codefendant as back seat passenger. Defendant wore a red shirt, and codefendant wore a black shirt. They were planning on picking up Duran, a friend and coworker of Rodriguez. Rodriguez wanted her along because she did not want to be by herself and Duran had previously socialized with defendant and Rodriguez. During the drive, Rodriguez saw a gun in the car, and they returned to Rodriguez's home so that defendants could hide the gun. In the alley near her home, codefendant gave defendant the gun to hide. When he returned to the car, he and the others went to pick up Duran. After Duran was picked up, they drove again to Rodriguez's home to get the gun, because codefendant said he wanted it to reload it. When they arrived in the alley again, defendant exited the car while Rodriguez and Duran went inside to use the washroom. Defendant returned the gun to codefendant and drove to codefendant's home. There, codefendant went inside while the others remained in the car. Afterwards, they were going to a hotel, with defendant still driving, when codefendant in the back seat fired two shots out of the car through the open window. (Defendant objected, which was overruled.) Rodriguez was nervous and scared, and Duran expressed the same and asked to exit the car. When Duran did so, defendant coaxed her back into the car by saying he would take her home. He did not, however. Instead, he went to pick up Rodriguez's sister, who wanted a ride.

¶ 36 On the way, defendant stopped the car at a gasoline station, and defendants exited the car. From where he parked, Rodriguez could not see inside the station building without turning all the way around. She did not see anyone else enter the station. She heard a gunshot, followed by defendants running back to the car seeming nervous and frantic. Codefendant remarked that he had to get out of there, and defendant drove the car away "fast." (Defendant objected, which was overruled.) Defendant may have said something, but Rodriguez could not recall what it was. Codefendant told defendant to take them to the woods, which Rodriguez took to mean he wanted to kill her and Duran. Defendant already had Rodriguez's cell phone, and codefendant demanded that Duran give him her cell phone or put it away. They picked up Rodriguez's sister and went to Rodriguez's home. Defendant told her to get clothes because he wanted to "leave town." Everyone went inside. When Rodriguez was in her bedroom with defendant, he told her that codefendant was going to kill Duran and told Rodriguez to stop crying or codefendant "was going to do the same to me." Codefendant came into the room and said "We need to do this now," which Rodriguez took to mean killing Duran. Rodriguez's sister then said that Duran had left, and codefendant said they needed to find her. They went back to the car, with defendant driving, and unsuccessfully searched the neighborhood for about 10 minutes.

¶ 37 They then went to codefendant's home, where defendant said he parked behind it to hide the car. They all went inside, where defendants laughed and codefendant remarked that he had "good aim," as he "shot him in the temple." Defendant remarked that he "saw the soul leave his body." Codefendant said they needed money to flee and told Rodriguez to burn her car. She saw codefendant cleaning the gun. Fearing that she would not see her son again, she asked defendant to let her call her son, which he did. Her sister told defendants that police were investigating, and

codefendant became "very panicky." A friend of codefendant Rodriguez knew only as "White Boy" came to codefendant's home, and codefendant told him to gather all the ammunition so they could remove it from the home. Defendants, Rodriguez, her sister, and White Boy left with a black bag. Defendant and Rodriguez went to his sister's home and then to the home of a friend of his, where they spent the night. Rodriguez then asked defendant if she could go home to get clothes. She had to ask for her cell phone to be returned so she could call her stepmother for a ride, as she was supposed to be saying that her own car broke down. However, when her stepmother came, they went to the police station, and she gave an account of the incident. Defendant called Rodriguez repeatedly, telling her to return and not discuss the incident with anyone.

¶ 38    On cross-examination, Rodriguez testified that she and defendant were in a hotel on the night in question for a "night out," when defendants decided to go for a drive. She invited Duran along because she did not want to be the only woman and "wanted to have somebody to talk to." When she saw defendant hiding the gun during the drive to meet Duran, it was wrapped up, and she surmised that it was a gun, and she did not see where defendant hid it except that he no longer had the package. After that, she repeatedly told defendant that she did not want to pick up Duran, but he insisted on it. Once they picked her up, Rodriguez could not encourage her to leave. During the night, Rodriguez vomited from nervousness. She had not drunk any alcohol that night, though defendants drank "a lot." While she was still scared and nervous when she and Duran went to the washroom, she did not urge Duran to leave. When codefendant fired the gun out of the car, Rodriguez and Duran were scared, but Rodriguez did not try to leave. When Duran left the car, Rodriguez helped defendant coax her back into the car. Defendants had stopped at the gasoline station because defendant wanted to buy pain medication and a drink, as he was feeling ill.

Defendants never discussed robbing the station. After the gunshot and defendants' hasty return to the car, they did not mention a robbery.

¶ 39    After leaving the gasoline station, defendant was trying to protect Rodriguez and Duran. When codefendant said they should take Rodriguez and Duran to the woods, defendant did not drive to the woods. When defendant warned Rodriguez to stop crying so codefendant would not kill her, defendant was not threatening to kill her. Defendant knew where Duran lived but merely searched the area near Rodriguez's home rather than going to Duran's home to look for her. Rodriguez acknowledged that she had not mentioned to police or in her grand jury testimony that she feared she would not speak to her son again. She did not leave while defendants slept because she was uncertain what was going to happen, but she knew defendant would not kill her.

¶ 40    On redirect examination, Rodriguez clarified that, though the gun was wrapped, she saw codefendant holding a gun and heard defendant referring to the package as a gun. Since going to the police about this case, Rodriguez moved to another state.

¶ 41    The parties stipulated that Rodriguez and her son visited defendant in jail once in the year following the incident.

¶ 42                                    5. Duran

¶ 43    Duran testified to being Rodriguez's friend and coworker in 2016, when defendant was Rodriguez's boyfriend and lived with her. Duran also knew defendant as "Block." On May 28, 2016, Rodriguez called Duran to ask her to "hang out," and she agreed. When Rodriguez arrived in her gray Saturn, defendant was driving, and another man was in the back seat. Duran had never seen that man before that night, and she identified codefendant as that man at trial. As they drove around, codefendant fired a black semiautomatic pistol out the car window once or twice. Duran

was uneasy about this and exited the car. Defendant and Rodriguez coaxed her back into the car. She agreed because her cell phone battery was low and she might be stranded otherwise. Defendant drove on to a gasoline station and parked at a pump, and defendants exited the car. From inside the car, Duran could see the door of the station building but could not see inside it without turning all the way around. She heard a gunshot, then saw defendants in the station doorway. Defendants ran to the car, and Duran saw that codefendant had the same gun as he fired earlier. When defendants entered the car, Duran recorded them with her cell phone. The camera was not aimed at defendants, but their voices could be heard on the recording, codefendant's voice being stronger because he was seated next to her. She stopped recording because her battery was "dying."

¶ 44 The recording was played at trial. In it, a man can be heard saying loudly and repeatedly "Block, get me the f*** out of here!" Another man's voice, faint and indistinct, is also audible. The brief recording ends with the sound of a car door closing.

¶ 45 Defendant then picked up Rodriguez's sister and drove to Rodriguez's home, where everybody in the car went inside. Duran stayed in the living room while Rodriguez and defendants went to a bedroom. Duran felt uncomfortable there, so she summoned a ride with her cell phone and left, having been in Rodriguez's home for only a few minutes. She later met with police, providing them her recording. A few days after the incident, she viewed a photographic array, after reading and signing an advisory form, and identified codefendant.

¶ 46 On cross-examination, Duran acknowledged that she did not hear defendants discuss a robbery before arriving at the gasoline station. In addition to not seeing inside the station building, she could not hear what was said there. After summoning a ride from Rodriguez's home, she "just walked out," and neither defendants nor Rodriguez contacted her or came to her home.

¶ 47                                6. Other Evidence

¶ 48    A physician testified to conducting Cionzynski's autopsy. He had a single gunshot wound to the head, fired at close range as shown by powder burns, and the bullet was recovered. His blood contained a significant amount of alcohol and also a metabolite of cocaine consumed within hours of death. He weighed 172 pounds and was 6 feet, 1 inch tall.

¶ 49    A forensic technician testified to examining and photographing the gasoline station on the morning of the incident. He took a swab of an apparent blood stain next to Cionzynski's body and swabs of the door handles. He recovered a spent shell casing within two feet of the body.

¶ 50    A police detective who participated in the June 2016 arrest of defendant and the September 2016 arrest of codefendant testified that defendant was about 6 feet tall and 200 to 220 pounds, while codefendant was about 5 feet, 7 to 9 inches tall and about 180 to 190 pounds.

¶ 51    A forensic scientist testified that DNA from the door handle swabs was compared to DNA from defendants. Defendant could not be excluded as a source, while codefendant could be excluded. The odds that someone other than defendant was the source was about "1 in 6 octillion Black; one in 150 sextillion White, or 1 in 160 sextillion Hispanic unrelated individuals."

¶ 52                                C. Closing Arguments

¶ 53    Defendant unsuccessfully moved for a directed verdict and chose not to testify.

¶ 54    The State's closing argument began:

" 'Block, get me the f*** out of here.' Damien Cionzynski, he didn't have to die. Unfortunately for Damien, that night his life crossed paths with the defendant and [codefendant] who that night were bent on bad acts. Damien didn't have to die, but Damien had a target on his back, he was drunk, that's all the target they needed. Because when the

defendant and [codefendant], when plan one didn't work of getting Syed out of that cage in the gas station, they changed their sights on Damien and Matt. Unfortunately for Matt and Damien, it would be only moments left for that friendship, because when they walked in there to simply buy cigarettes that night, they were met by two men bent on doing bad acts that night, two men who executed Damien in that BP gas station."

The State went on to discuss the elements of first degree murder and how the trial evidence showed those elements. In part, the State argued

"Partners, partners in crime. We have [defendant]. He comes in, his job in the partnership, patting the pockets, trying to get what he can. Let me back up, before that, being the ruse outside, pretending to vomit. [Codefendant's] part, he's the one with the gun, he's the backup, he's the heat. They're working together because alone they can't do these bad acts they want to do. They need each other to do these bad acts."

The State argued that the evidence that defendants worked together included the evidence of defendant hiding and retrieving the gun, not objecting when codefendant fired from the car, and helping coax Duran back into the car. The State also argued that defendants' actions after the incident showed they were working together. Defendant made only one objection, to a remark that he searched Handley with his hand.

¶ 55                                    D. Verdicts and Judgment

¶ 56    The jury was instructed on the three theories of first degree murder, including felony murder based on attempted robbery. Following deliberations, the jury found defendant guilty of

first degree murder and found that he, or someone for whose conduct he was responsible, was armed with a firearm during that offense.[1]

¶ 57    In addition to arguing insufficiency of the evidence, defendant's posttrial motion as amended argued that the court erred in granting the State's motions *in limine* and that the State made improper closing arguments. Defendant pointed to the State's arguments that defendants "were 'best friends' and 'partners' intent on 'doing something bad,' committing crimes, and engaging in 'bad acts' in the early morning hours of May 28, 2016." The court denied the motion. It found the evidence against defendant to be clear, including that the jury found him guilty on an accountability basis, as it was instructed on accountability and defendant "was not the shooter."

¶ 58    Following a sentencing hearing, the court sentenced defendant to 40 years' imprisonment. Defendant's postsentencing motion was denied, and this appeal followed.[2]

¶ 59                                III. ANALYSIS

¶ 60    On appeal, defendant contends that the court erred in admitting (1) evidence that codefendant had fired a gun from a car defendant was driving and (2) codefendant's hearsay statements as evidence of defendant's consciousness of guilt. He also contends that the evidence was insufficient to convict him of first degree murder beyond a reasonable doubt and that the State misstated the law in closing arguments. We shall first address the sufficiency of the evidence.

---

[1]The trial court found codefendant guilty of first degree murder and found that he personally discharged a firearm proximately causing death.

[2]The court sentenced codefendant to 85 years' imprisonment including the firearm enhancement for personal discharge causing death. His appeal is pending separately. People v. Mujkovic, No. 1-20-0717 (Ill. App. Ct.).

¶ 61                      A. Sufficiency of the Evidence

¶ 62    Defendant contends that the evidence was insufficient to convict him of first degree murder.

¶ 63    When the sufficiency of trial evidence is at issue, we must determine whether, taking the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Jackson*, 2020 IL 124112, ¶ 64. That standard applies to both direct and circumstantial evidence. *Id.* Taking the evidence in the light most favorable to the State includes making all reasonable inferences from the evidence in the State's favor. *People v. Eubanks*, 2019 IL 123525, ¶ 95. It is the responsibility of the trier of fact to weigh, resolve conflicts in, and draw reasonable inferences from the evidence. *Jackson*, 2020 IL 124112, ¶ 64. The testimony of a single witness is sufficient to sustain a conviction if the testimony is positive and credible, even if it is contradicted. *People v. Harris*, 2018 IL 121932, ¶ 27. A trier of fact may consider the evidence in light of his or her own knowledge and observations in the affairs of life. *People v. Newton*, 2018 IL 122958, ¶ 28. We do not retry a defendant or substitute our judgment for that of the trier of fact regarding witness credibility or the weight of evidence. *Jackson*, 2020 IL 124112, ¶ 64.

¶ 64    A trier of fact is not required to disregard inferences that flow normally from the evidence, nor to seek all possible explanations consistent with innocence and elevate them to reasonable doubt. *Id.* ¶ 70. In other words, the State need not disprove or rule out all possible factual scenarios. *Newton*, 2018 IL 122958, ¶ 27. A trier of fact need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances if the evidence as a whole satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt. *Jackson*, 2020 IL 124112, ¶ 70. A conviction will be

reversed only if the evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt of the defendant's guilt remains. *Id.* ¶ 64.

¶ 65    A person commits first degree murder when he or she

"kills an individual without lawful justification *** if, in performing the acts which cause the death:

(1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) he is attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9-1(a) (West 2016).

Intent, knowledge, and other mental states may be proven circumstantially and inferred by the trier of fact. *Eubanks*, 2019 IL 123525, ¶ 74. A defendant is presumed to intend the natural and probable consequences of his or her acts. *People v. Kirkpatrick*, 2020 IL App (5th) 160422, ¶ 63.

¶ 66    Under criminal law, a defendant is accountable for another's conduct if:

"either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense.

When 2 or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts. Mere presence at the scene of a crime does not

render a person accountable for an offense; a person's presence at the scene of a crime, however, may be considered with other circumstances by the trier of fact when determining accountability." 720 ILCS 5/5-2(c) (West 2016).

In determining accountability, a trier of fact may consider a defendant's presence during the commission of the crime, continued close association with other offenders after its commission, failure to report the crime, and flight from the scene. *People v. Cerda*, 2021 IL App (1st) 171433, ¶ 75. A common purpose or design may be inferred from the circumstances and need not be supported by words of agreement. *Id.*

¶ 67 Here, taking the evidence in the light most favorable to the State as we must, we find that a reasonable trier of fact could find defendant guilty of first degree murder. The video and the testimony taken together show that codefendant displayed a gun in his right pocket to Handley and defendant then gestured to codefendant behind him as codefendant kept his hand on the gun in his right pocket. Though defendant had his back to codefendant at the time, it is reasonable to infer from the evidence of the earlier shooting from the car and the coordination of defendants' actions in the gasoline station—defendant gestured to codefendant, who put his hand on his gun—that defendant knew codefendant had a working firearm at hand. A trier of fact could reasonably infer that defendants cooperated to threaten Handley with the gun.

¶ 68 The video then clearly shows defendant physically attacking Handley and Cionzynski. Showing the gun to Handley had the apparently desired effect: Handley stepped back from defendant's attack instead of defending himself. Only after defendant's dual attacks did Cionzynski lunge toward defendant. A reasonable trier of fact could infer that defendant attacked Handley and Cionzynski—and not remotely *vice versa*—knowing that he had armed "backup"

from codefendant, his close friend. However, it is apparent from the video—and would have been apparent to defendants—that Cionzynski's attention was on his purchase until defendant attacked Handley. The natural consequence of attacking Handley and Cionzynski when the latter was likely unaware of the gun ensued: Cionzynski tried to defend himself from defendant's unprovoked attacks on his friend and himself. Defendants having brought a gun to a fistfight, they then put it to use with codefendant's single but fatal gunshot. We conclude that a reasonable trier of fact could find defendant guilty of first degree murder under such circumstances.

¶ 69                                B. Evidentiary Rulings

¶ 70    Defendant also contends that the court erred in admitting (1) evidence that codefendant had fired a gun from a car defendant was driving and (2) codefendant's hearsay statements as evidence of defendant's consciousness of guilt.

¶ 71    Generally, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith" but is "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). In other words, evidence of other crimes is admissible if it is relevant for any purpose other than to show the defendant's propensity to commit crime. *People v. Pikes*, 2013 IL 115171, ¶ 11. One of the admissible purposes exists when the other crime is part of a continuing narrative of the events giving rise to the offense that help explain the circumstances of the offense. *People v. Ware*, 2019 IL App (1st) 160989, ¶ 40. Other-crimes evidence is admitted under a balancing test, with the evidence excluded if the prejudice therefrom substantially outweighs its probative value. *Pikes*, 2013 IL 115171, ¶ 11.

¶ 72    The admission of evidence is within the sound discretion of the trial court, and a reviewing court will not reverse the court's decision absent an abuse of that discretion. *People v. King*, 2020 IL 123926, ¶ 35. A court will not be found to have abused its discretion with its evidentiary rulings unless the decision was arbitrary or fanciful or if no reasonable person would take the view adopted by the court. *Id.* Erroneous decisions on the admission of evidence are subject to harmless error analysis. *Id.* ¶ 40. Our supreme court has recognized three approaches to determining whether an error is harmless: whether (1) the error contributed to the defendant's conviction, (2) the other evidence in the case overwhelmingly supported the defendant's conviction, and (3) the challenged evidence was duplicative or cumulative. *Id.*

¶ 73    Here, we conclude that the evidence of the earlier shooting from the car was more probative than prejudicial so that the trial court did not abuse its discretion in admitting it. It was relevant to the issue of whether defendant knew that codefendant had a working firearm in the gasoline station when defendant attacked Handley and Cionzynski. It was particularly relevant when the evidence showed that defendant had his back to codefendant as he interacted with Handley. The evidence was also relevant as a continuing narrative of the events of the night in question. That codefendant had a gun and was willing to fire it randomly, and that defendant knew that, are highly relevant to understanding what happened in the gasoline station a short time later—that is, to showing that defendant knew that codefendant would back him up when he attacked Handley and Cionzynski.

¶ 74    Defendant contends that the evidence that codefendant fired from the car was particularly prejudicial and cumulative of the evidence that defendant hid the gun and retrieved it and codefendant reloaded it. However, Rodriguez's testimony that defendant retrieved the gun because codefendant said he wanted to reload it is neither cumulative of, nor as probative as, the evidence

at issue. That evidence showed not only that defendant knew the gun was in working order shortly before the incident but that defendant knew codefendant was willing to fire it and risk harm to random or unknown persons.

¶ 75    As to the testimony of Rodriguez and Duran concerning codefendant's statements made after the incident at the gasoline station, we need not address the propriety of its admission because we find it harmless beyond a reasonable doubt, as the evidence of defendant's guilt was overwhelming. The testimony and video concerning the incident, and the evidence of the preincident shooting corroborating defendant's knowledge of codefendant's gun and willingness to use it, were ample by themselves to convict him. Stated another way, the jury did not need any evidence of defendant's postincident consciousness of guilt to find him guilty.

¶ 76                                    C. Closing Arguments

¶ 77    Lastly, defendant contends that prosecutors misrepresented the law in closing arguments when they "did not confine their argument to the charged conduct" but "essentially argued that [defendants] were engaged in criminal conduct and 'bad acts' for the entirety of the evening in question and, since a death occurred, [defendant] was guilty of first degree murder."

¶ 78    As a threshold matter, while defendant raised a claim of improper closing arguments in his posttrial motion, he made no objections during closing arguments to the State's remarks that defendants were engaged in "bad acts" on the night in question. A claim not raised by objection and preserved in a posttrial motion is forfeited. *Jackson*, 2020 IL 124112, ¶ 81. This court will consider a forfeited error if it is plain error, that is, if a clear or obvious error occurred and (1) the evidence was so closely balanced that the error alone threatened to tip the scales of justice or (2) the

error was so serious that it alone affected the fairness of the proceedings. *Id.* In considering a claim of plain error, we may first determine whether reversible error occurred. *Id.*

¶ 79    Generally, prosecutors have wide latitude in the content of closing arguments and may comment on the evidence and any fair and reasonable inferences therefrom even if a suggested inference is negative for the defendant. *Id.* ¶ 82. On review, we consider the closing argument as a whole rather than focusing on selected phrases or remarks. *Id.* The standard of review for a prosecutor's closing argument is similar to the standard for plain error, whereby a defendant must demonstrate that the remarks were improper and so prejudicial that real justice was denied or the verdict resulted from the error. *Id.* ¶ 83.

¶ 80    Here, we find that the State did not make an improper argument. In context, the State was not arguing "defendant's propensity to commit crime" (*Pikes*, 2013 IL 115171, ¶ 11) or that defendants were bad men in general. Instead, the State's argument was that the actions of defendants *on the night in question*, in the hours and minutes directly leading up to the gasoline station incident, showed that they were responsible for each other's actions because they repeatedly cooperated on the night in question. Moreover, their cooperation before, during, and after the incident was in support of actions or goals that were, to say the least, less than salutary. As we stated above, the court properly admitted evidence of a continuing narrative of the events leading up to the incident. We therefore find no error in the State arguing that said evidence established such a narrative.

¶ 81                                    IV. CONCLUSION

¶ 82    Accordingly, the judgment of the circuit court is affirmed.

¶ 83    Affirmed.

---

**No. 1-20-0635**

---

| | |
|---|---|
| **Cite as:** | *People v. Mulosmani*, 2021 IL App (1st) 200635 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-CR-15404; the Hon. James B. Linn, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Thomas M. Breen, Todd S. Pugh, Jonathan M. Brayman, Robert W. Stanley, and Chelsy L. Van Overmeiren, of Breen & Pugh, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (John E. Nowak and Mary L. Boland, Assistant State's Attorneys, of counsel), for the People. |

---